UNITED STATES, Appellant

v

RONALD A. KILGORE, Private First Class,
U. S. Army, Appellee

21 USCMA 35, 44 CMR 89

No. 24,003

August 6, 1971

*Captain Richard L. Menson* argued the cause for Appellant, United States. With him on the brief were *Colonel David T. Bryant* and *Lieutenant Colonel Ronald M. Holdaway.*

*Captain Stewart Pettet Davis* argued the cause for Appellee, Accused. With him on the brief were *Colonel George J. McCartin, Jr.,* and *Major Alan W. Cook.*

## Opinion of the Court

QUINN, Judge:

Two questions have been certified by the Judge Advocate General of the Army to review the correctness of the setting aside of the accused's conviction by the United States Army Court of Military Review on the ground that there was "a complete failure" on the part of the trial judge to explain to the accused, in connection with his plea of guilty, the elements of the eleven offenses with which he was charged, within the meaning of United States v Care, 18 USCMA 535, 40 CMR 247 (1969). They are as follows:

Was the Court of Military Review correct in holding that as a matter of law the military judge's discussion of the technical elements of the offenses did not comply with the mandate of United States v Care, 18 USCMA 535, 40 CMR 247 (1969)?

Was the Court of Military Review correct in determining that the question of prejúdice was irrelevant to post-Care decisions, since Article 59 (a), Uniform Code of Military Justice, 10 USC § 859, requires that a "finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless

the error materially prejudices the substantial rights of the accused"?

The record indicates that the trial judge conducted a lengthy examination of the accused to assure himself that the accused understood the meaning and the consequences of his plea of guilty. In the course thereof, he advised the accused that a plea of guilty "admit[ted] every fact and every technical element contained in" each specification. He questioned the accused closely as to the factual allegations of various specifications, but did not separately detail the elements of each offense, either by way of preface or summary. To exemplify the scope and nature of the whole colloquy, we have set out below the part dealing with Charge I and its specification, which alleges an unauthorized absence from "on or about 0500 hours, 8 September 1969, . . . until on or about 1900 hours, 23 September 1969," and in the Appendix we have included the discussion as to one specification of the three other charges:

"MJ: I indicated a few minutes ago that you would admit every fact and every technical element contained in these various specifications. At

this time I would like to discuss these a little more fully with you. What unit were you assigned to on the 7th of September 1969?

"ACCUSED: B Troop, 1st of the 10th Cav, sir.

. . . . . .

"MJ: I gather that you were present for duty on the 7th?

"ACCUSED: Yes, sir.

"MJ: Now, did you in fact leave your unit the next day?

"ACCUSED: Yes, sir.

"MJ: Now, do you recall about what time it was?

"ACCUSED: No, sir, I don't recall.

"MJ: The specification says 0500. Is that—

"ACCUSED: It could be on or about—

"MJ: It could be 0500 in the morning?

"ACCUSED: Yes, sir.

. . . . . .

"MJ: . . . You admit then that you were absent without leave until the 23d of September?

"ACCUSED: Yes, sir.

"MJ: You have no question in your own mind that you were absent without leave until the 23d of September?

"ACCUSED: Yes, sir.

"MJ: At the time you left your unit at 0500 on the 8th of September 1969, did you have permission from anyone in Troop B or in 10th Cavalry, or anyone else in authority to be absent from your unit?

"ACCUSED: No, sir.

"MJ: Did you tell anyone that you were absent without leave?

"ACCUSED: No, sir."

A reading of the record leaves us with the compelling conviction that the accused knew and understood that the judge's questions were concerned with "every technical element" of the offenses. At the beginning of the discussion, he was advised that the judge would "explain what the technical elements of the offenses" were. From the detail and the progression of questions asked him, he could only conclude that each group of questions dealing with a particular offense covered the essential requirements of proof for that offense. We are satisfied that the military judge complied with *Care's* requirement that he "explain the elements" of the offenses to which the accused pleads guilty. *Id.,* at page 541; see also United States v Bingham, 20 USCMA 521, 43 CMR 361 (1971).

We answer the first certified question in the negative. That answer makes it unnecessary to consider the second question.

The decision of the Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General for submission to the Court of Military Review for further proceedings consistent with this opinion.

Chief Judge DARDEN and Senior Judge FERGUSON concur.

## APPENDIX

"MJ: Now, looking on down the charge sheet, I call your attention— I think we will go to Specification 2, since it occurred first in the point of time. Do you know First Lieutenant John A. Plummer?

ACCUSED: Yes, sir.

MJ: Who is Lieutenant Plummer?

ACCUSED: He used to be Bravo Troop's XO.

MJ: XO, he was Executive Officer of Bravo Troop?

ACCUSED: Yes, sir.

MJ: How long have you known Lieutenant Plummer?

ACCUSED: Well, I hadn't really known him until October 24th.

MJ: You had never seen him before?

ACCUSED: I seen him one time out in the field, but I never spoke to him.

MJ: But did you know who he was?

ACCUSED: Yes. When I saw him I knew who he was.

MJ: Did you know who he was on the 27th of October?

ACCUSED: Yes, sir.

MJ: Do you remember how he was dressed?

ACCUSED: Yes, sir.

MJ: How was he dressed?

ACCUSED: He was dressed in fatigues, dressed in the Army uniform.

MJ: The regular uniform. You never had any trouble telling he was an officer?

ACCUSED: No, sir.

MJ: And you did know that he was the executive officer of B Troop?

ACCUSED: Yes, sir.

MJ: Did you know that he was a first lieutenant?

ACCUSED: Yes, sir.

MJ: Did you have a discussion with him sometime around 1700 on the 27th of October?

ACCUSED: Yes, sir.

MJ: What was the nature of this conversation?

ACCUSED: Well, it was about going on guard, sir.

MJ: You were at guard mount— or he just—where did he contact you?

ACCUSED: In front of the orderly room.

MJ: In front of the orderly room. Were you supposed to go on guard or did he just pull you out?

ACCUSED: He just told me to go on guard.

MJ: Now, where was this?

ACCUSED: Guard?

MJ: Where did the conversation take place?

ACCUSED: Right in front of the orderly room.

MJ: Which is located here at Camp Enari?

ACCUSED: Yes, Camp Enari.

MJ: And what did he tell you to do?

ACCUSED: He told me to get a flak jacket and a weapon and some web gear and to go on guard.

MJ: To draw your equipment?

ACCUSED: Yes, sir.

MJ: Did he tell you what kind of guard you were going on, perimeter guard or what?

ACCUSED: No. He just said that I was going on guard.

MJ: Why—did you have anything to say to him?

ACCUSED: I asked him—I just told him that I wasn't going on guard.

MJ: Did you have any reason for telling him you weren't going?

ACCUSED: It was a personal matter, sir.

MJ: Did you understand his order?

ACCUSED: Yes, sir.

MJ: Did you feel that he had a right to give it to you?

ACCUSED: Yes, sir.

MJ: You feel that it was a lawful order?

ACCUSED: Yes, sir, I think it was lawful.

MJ: And that he was an officer, and you believe that an officer, that an executive officer has a right to give you an order to go on guard?

ACCUSED: Yes, sir.

MJ: Did you in fact obey the order?

ACCUSED: No, sir, I did not obey it.

MJ: Did you intend to defy his order which he gave, when you said you weren't going?

ACCUSED: Yes, sir."