UNITED STATES, Appellee,

v.

Philadelphio B. JEMMINGS, Staff Sergeant, U.S. Army, Appellant.

No. 30,403.

U. S. Court of Military Appeals.

May 14, 1976.

*Captain Raymond R. Froelich, Jr.* argued the cause for appellant, accused. With him on the brief were *Colonel Alton H. Harvey, Lieutenant Colonel James Kucera, Major Richard J. Goddard,* and *Captain Theodore H. Watts.*

*Captain Russell S. Estey* argued the cause for appellee, United States. With him on the brief were *Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr., Captain John R. Erck,* and *Captain Jonathan D. Glidden.*

## OPINION OF THE COURT

FLETCHER, Chief Judge:

Inquiring into the providence of the accused's plea of guilty to a housebreaking charge which alleged an unlawful entry into a military commissary in Giessen, Germany, with intent to commit larceny, the trial judge was advised by the accused that, prior to the unlawful entry, several German nationals had threatened him and his children who also were living in Germany. Perceiving a possible defense of duress, the trial judge inquired further and elicited the following responses:

ACCUSED: I went to the movie in Butzbach . . . and on the way back as I came out of the kaserne there was the BMW on the left-hand side. He had his parking lights on. I saw him as I pulled out of the kaserne. He pulled in behind me. . . . When I came to the first curve [he] was gone.

I was pulled over by this Porsche, and then this was when—They pulled me over and told me, "Okay, baby, I got you now. Let's talk about cigarettes." He said, "You're not going to get away this time. I know where you're at. We are going to get the cigarettes. Don't think you're getting over on me."

One thing led to another. The Porsche took off. I left with my car, and the BMW followed me, and there was VW buses behind me, the BMW. I got to my home. There was a Capri pulled in front of me. The comment was made to me, "Hey, you're supposed to go with us." I said, "If I don't?" The man said, "Well, we'll have ways to take care of that." I shook my head, got in the car, and went to the commissary. . . .

They wanted to see how to get in. I showed them how to get in, and they sent me out to keep an eye out, look around, and see what was going on.

.    .    .    .    .

[TRIAL] JUDGE: Were there any threats made to you, other than, "We've got you now?" Did he tell you anything else?

ACCUSED: Earlier the comment had been made, "You've got your children in school now, don't you? One goes in the morning, and the other in the afternoon. How's the family?"

[TRIAL] JUDGE: Was that during the time you were with them?

ACCUSED: This was when they stopped me.

.    .    .    .    .

[TRIAL] JUDGE: Did you think they were going to do something to you, serious bodily harm or death?

ACCUSED: Not at this time, sir.

[TRIAL] JUDGE: They had opportunity to do it before, hadn't they?

ACCUSED: Yes, sir.

[TRIAL] JUDGE: They had opportunity to do something to your children before, if they wanted to?

ACCUSED: I imagine they would have. I tried to keep a close eye on the children.

.  .  .  .  .

[TRIAL] JUDGE: Let me ask you a question, Sergeant Jemmings. You mentioned the fact that you were threatened. Were you afraid that you were going to be killed or great bodily harm, serious bodily harm was going to be inflicted upon you at the time you went down to the commissary and assisted these people, showing how to do it and went and showed them where the cigarettes were?

ACCUSED: Not to myself. I was more scared that repercussions would happen to my family.

[TRIAL] JUDGE: All right. Were you afraid that something was going to happen to you that night, if you refused?

ACCUSED: No, not to myself, no.

[TRIAL] JUDGE: Did you think that something was going to happen that night to your children?

ACCUSED: Not that night, no sir.

.  .  .  .  .

[TRIAL] JUDGE: Is it your opinion now that you really didn't have to go down, you could have gotten out of going down to the commissary if you had gone in the house and called the MPs or something? Is that what you are telling me?

ACCUSED: Yes, sir.

.  .  .  .  .

[TRIAL] JUDGE: What you decided then is under the law there is no defense of duress or coercion; is that right?

ACCUSED: Okay—

[TRIAL] JUDGE: Is that why you are pleading guilty? Legal duress or coercion?

ACCUSED: This thing, it was on my nerves. It really was. I didn't see any way out of it.

[TRIAL] JUDGE: Did you fear serious bodily harm or death?

ACCUSED: Not to myself. Something to my family was what I was more scared of.

[TRIAL] JUDGE: Let me ask you: You say you were under a lot of strain. In other words, you were psychologically pushed into this? Is this what you are saying?

ACCUSED: Yes, sir.

[TRIAL] JUDGE: Psychologically. Mentally. In other words, you wouldn't have done it otherwise? Is that what you were going to say, if these people hadn't forced you into this?

ACCUSED: Yes, sir.

[TRIAL] JUDGE: Well, since the law of duress is that the accused must feel that he is going to be killed immediately or immediately suffer serious bodily harm to himself, I will consider that as being the law. However, there is such a thing as psychological, mental duress.

Appellant suggests that his responses during the guilty plea inquiry and similar replies given during his presentencing testimony were sufficient to raise the defense of duress thereby requiring the trial judge to reject his plea to the housebreaking charge. *United States v. Pinkston*, 18 U.S.C.M.A. 261, 39 C.M.R. 261 (1969); *see United States v. Timmins*, 21 U.S.C.M.A. 475, 45 C.M.R. 249 (1972). *See also United States v. Care*, 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969). Resolution of the providence question turns, in part, upon whether the defense of duress extends to threats against one's immediate family as opposed to threats against the person actually asserting the defense.

In *Pinkston*, after the accused tendered a plea of guilty to larceny and wrongful appropriation, his counsel informed the law officer that information would be submitted in mitigation "that the accused was motivated to steal by fear of harm to his

fiancee and child." *Id.* at 263, 39 C.M.R. at 263. The law officer nevertheless accepted the plea and opined that such a circumstance " 'would not be a defense to the commission of the offenses as set forth.' " *Id.* In his subsequent testimony prior to sentencing, the accused related that his fiancee and son had been threatened with death by local nationals if he did not comply with their demands. In addition, he testified that one of his friends had been shot by the same group and that he had been restricted after a criminal investigator warned of the local nationals' intention to kill him. Finding the pleas of the accused improvident, we held that threats against the accused's fiancee and child constituted a "possible defense." *Id.*

The Government points to *United States v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1 (1973), in urging that appellant's responses do not bring him within the *Pinkston* rationale. In *Logan*, the accused's testimony during the providence inquiry suggested that his motivation for committing a larceny offense in Korea was not only out of concern for the safety of his family in the United States but also his need for money. The considerable distance between the situs of the threat and that of the purported victim coupled with the accused's acknowledgement that personal monetary gain played a part in his decision to commit the larceny satisfied us that there was no "well-grounded apprehension of immediate death or serious bodily harm if he did not participate in the venture." *Id.* at 351, 47 C.M.R. at 3.

The standard for determining whether to accept a tendered plea of guilty is statutorily prescribed in Article 45(a), Uniform Code of Military Justice, 10 U.S.C. § 845(a):

If an accused after arraignment makes an irregular pleading, or after a plea of guilty sets up matter inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect . . . a plea of not guilty shall be entered in the record

and the court shall proceed as though he had pleaded not guilty.

In resolving the providence question raised, the Court of Military Review held: [1]

Examining appellant's statements within the context of the special defense of duress we note that appellant denied that he was under fear of immediate death or serious bodily harm. At best he considered the threat as one to injure himself or his family in the future. He considered that he had a reasonable opportunity to avoid committing the act without subjecting himself to threatened danger and could have taken steps to avoid the danger. Likewise, there is no indication from the statements or the facts that appellant considered his children to be under danger of any immediate harm.

.     .     .     .     .

We do not agree with appellant's contention that the judge improperly considered the law of duress as being limited to threats of immediate harm to appellant alone. While it is true that at times the judge spoke in terms of imminent danger to appellant only, his inquiry taken as a whole indicates that he was aware of the broader possibilities with respect to the law of duress.

We believe the appellant's plea of guilty must be set aside for two separate, although interrelated, reasons. The first concerns the trial judge's explanation of the defense of duress. Even though the Court of Military Review suggested that the judge's colloquy indicated an awareness "of the broader possibilities" of duress rather than a concept limited to actual threats against the accused, we find insufficient evidence in the record to support such a conclusion. In fact, his advice to the accused was to the contrary:

Well, since the law of duress is that the accused must feel that *he* is going to be killed immediately or immediately suffer serious bodily harm *to himself*, I will consider that as being the law. (Emphasis added.)

---

1. *United States v. Jennings*, 50 C.M.R. 247, 248 (1975).

■ Where an accused's responses during the providence inquiry suggest a possible defense to the offense charged, the trial judge is well advised to clearly and concisely explain the elements of the defense in addition to securing a factual basis to assure that the defense is not available. Without such advice, the accused's understanding of the "meaning and effect" of his plea is left open to question. Article 45(a), UCMJ. *See United States v. Timmins, supra* at 479, 45 C.M.R. at 253. Indeed, much of the difficulty in resolving the providence issue before us stems from the absence of such an explanation. While, in a related context, we have sanctioned questioning by a trial judge which covers the essential ingredients of a criminal offense without actually listing them,[2] the risk there, as here, is that the questioning does not sufficiently elicit the responses necessary to conclude that the plea is provident.

■ With regard to whether the accused's statements were actually inconsistent, we again must part company with the Court of Military Review. The judge's inquiry ended with the accused insisting that he "wouldn't have done it . . . if these people hadn't forced [him] into this." Never did he disavow his fear that his family was in imminent danger if he did not cooperate in the housebreaking enterprise. True, he did acknowledge that his children might not be harmed "that night"; however, he also stressed that he had twice sought the assistance of his unit commander to apprehend these individuals only to be told, "Wait a minute. I don't want to know nothing about it. I'm a married man now. I can't be playing no cops and robbers."

Accepting the accused's version at face value, as we must in determining the providence of his plea, we cannot say that he satisfactorily disclaimed the duress defense. The immediacy element of the defense is designed to encourage individuals promptly to report threats rather than breaking the law themselves. *See People v. Otis,* 174 Cal.App.2d 119, 344 P.2d 342 (1959). The accused's responses suggest that his attempts to assist the authorities in ending the danger to his children as well as the blackmarketing operation fell upon deaf ears. It, therefore, cannot be said that his acknowledgement that his children would not be harmed "that night" ended the threat of immediate grievous bodily harm to them.

The decision of the United States Army Court of Military Review is reversed as to the housebreaking charge. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Military Review. The court may dismiss the housebreaking offense and reassess the sentence, or a rehearing as to the affected charge and as to the sentence may be ordered.

Senior Judge FERGUSON concurs.

COOK, Judge (dissenting):

In assessing the implications of the accused's responses, during the inquiry into the providence of his plea of guilty, I think it important to note that, although he admitted he could have left the scene of the burglary without further incident, he deliberately assaulted a guard and intentionally inflicted grievous bodily harm upon him. Neither at trial nor on this appeal has he suggested that the latter offense was induced by fear of harm to himself or his family. In my opinion, the circumstances of this aggravated assault cast a different light upon the accused's statements than that in which they are viewed by the majority.

The defense of duress is available to an accused only if his commission of the crime charged resulted from reasonable fear of imminent death or grievous bodily harm to himself or his family. The risk of injury must continue throughout the criminal venture. *See United States v. Fleming,* 7 U.S. C.M.A. 543, 558, 23 C.M.R. 7, 22 (1957).

Here, while the accused represented he was confronted with various threats of injury, he admitted that he did not fear inju-

2. *See United States v. Kilgore,* 21 U.S.C.M.A. 35, 44 C.M.R. 89 (1971).

ry to himself or his family on the night of the incident. Moreover, he testified that while he was standing outside checking on the whereabouts of the security guard, "the guard came around the corner" and they met "face to face." Rather than alerting the guard of his situation and commission of the crime taking place inside, he struck the guard with his hand, knocking the guard down. The guard then struck the accused. Thereafter, the accused struck the guard in the head and in the arms with a piece of lumber which the accused testified he believed to be "a pick handle." The guard fell and the accused struck him again. Had the accused chosen to alert the guard rather than attacking him, at least the success of the criminal endeavor might have been aborted. As paragraph 216f of the Manual for Courts-Martial, United States, 1969 (Rev.), indicates, when "the accused has a reasonable opportunity to avoid committing the act without subjecting himself to the threatened danger, his act is not excusable." *See United States v. Roby*, 23 U.S.C.M.A. 295, 49 C.M.R. 544 (1975).

Considering the whole of the accused's account of the circumstances of the commission of the offenses, I am satisfied the trial judge properly concluded the accused was not negating his plea of guilty by asserting an honest and reasonable belief that he could not escape participation in the burglary, without risk to his life or limb, or like danger to his family. Nor am I persuaded that his explanation indicates a present capability on the part of those threatening him to effectuate their threats of harm to his children if he refused to participate in perpetration of the offenses. I would, therefore, affirm the decision of the United States Army Court of Military Review.