**UNITED STATES**

v.

**Airman First Class William W. PHRAMPUS, FR149–60–7524 United States Air Force.**

**ACM 28940.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 6 Sept. 1990.

Decided 24 Jan. 1992.

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens and Captain Beverly B. Knott.

Appellate Counsel for the United States: Colonel William R. Dugan, Jr., Lieutenant Colonel Brenda J. Hollis, and Major Paul H. Blackwell, Jr.

Before O'BRIEN, PRATT and McLAUTHLIN, Appellate Military Judges.

## OPINION OF THE COURT

PRATT, Senior Judge:

The appellant, Airman First Class Phrampus, was convicted, in accordance with his pleas, of the sale of military property, false swearing, bad checks, desertion, and the fraudulent use of a debit card.[1] It is this latter offense, charged under Article 123a, 10 U.S.C. § 923a, which is the focus of the assigned error in this case. The specification reads, in pertinent part:

> ... with intent to defraud and for the procurement of food and lodging, things of value, wrongfully and unlawfully make and utter to the Hotel Belvedere a check upon [a bank] to wit: Check Smart dated 04 May 1990 in the amount of $636.27, then knowing that he, the maker thereof, did not or would not have sufficient funds in or credit with such bank for the payment of the said check in full upon their [sic] presentment.

---

1. In this bench trial, appellant was sentenced to a bad-conduct discharge, confinement for 22 months, forfeiture of all pay and allowances, and reduction to E–1. The convening authority approved the sentence as adjudged; a pretrial agreement would have limited his confinement to 24 months.

Appellate defense counsel assert that Phrampus' plea of guilty to this offense was improvident for two reasons. First, they point out that, during the providence inquiry, Phrampus made statements inconsistent with a plea of guilty. Specifically, in the course of explaining his offense to the military judge, Phrampus stated that he did not recall signing any document representing the entire amount of the bill for $636.27. This statement, counsel argue, is inconsistent with his plea of guilty to making and uttering a check for that amount. Second, appellate defense counsel contend that the true nature of Phrampus' Check Smart Card was that of a typical credit card, not a "check" payable to the order of someone. For reasons associated with both of these assertions, we agree that Phrampus' plea was improvident.

 It is well established that, in assessing the adequacy of a providence inquiry, we will look at the entire inquiry. *United States v. Crouch*, 11 M.J. 128 (C.M.A.1981). Having done so here, including a close look at the stipulation of fact entered into by the parties in conjunction with the plea, we are unable to discern sufficient information to sustain the providence of appellant's guilty plea to this offense.

In accordance with a pretrial agreement, Phrampus made a good faith attempt to successfully plead guilty, explaining to the trial judge the nature of his debit card:

ACC: Your Honor, a Check Smart Card is a more accepted—more readily accepted to the merchant form of a check. It appears to be a credit card. It has—it's got the VISA stamp on it, but it works as a secured check. When you sign the contract and when you present the card, you're signing a check, except for the—supposedly the merchant doesn't take the fall if it bounces.

MJ: It's really a form of check then, right?

ACC: Yes, it is, Your Honor.

\* \* \* \* \* \*

MJ: It operates in the same manner as if you were writing a check on that [checking] account?

ACC: Yes, it does, Your Honor.

Phrampus' explanation of the specifics of his offense, however, although undoubtedly still in good faith, was considerably less helpful:

MJ: Go ahead and tell me what happened the 4th through the 7th of May?

ACC: Um, when I was in Baltimore, Your Honor, I arrived in Baltimore and needed lodging. It had been my discovery that with that system, with the Check Smart system, not every place took it. Some places it would be declined and the Belvedere being a higher class establishment, I decided to try there and it did, indeed—was accepted there and that's why I stayed there, Your Honor. I used the Check Smart Card for food and lodging.

MJ: It shows the amount of $636.27?

ACC: That's correct, Your Honor.

MJ: Was that the total amount of food and lodging that you received there at the Hotel Belvedere?

ACC: I believe it to be, sir.

\* \* \* \* \* \*

MJ: Do you sign some kind of a document whenever you do that—do you sign like a receipt or something like a—how do they use the card I guess is what I'm saying?

ACC: *I don't remember if I had to sign anything or not* for things like where they ran it through the machine—*I'm not sure if I had to sign anything or none of that.* You do have to sign just like a credit card slip on anything such as meals or anything like that—they bring you your check, you sign it and charge it to your room.

MJ: When you checked into the hotel, did you tell them that you were going to be paying for all of this with this Check Smart Card?

ACC: Yes, I did.

MJ: And they said that that was acceptable?

ACC: Yes, they did.

MJ: *You don't recall whenever you totaled up the bill whether you signed for the total amount or anything?*

ACC: *No, Your Honor, I never totaled up a bill,* Your Honor. I left that morning.

(Emphasis added.)

Typically in guilty plea cases, a stipulation of fact is entered into by the parties to definitively cover each of the offenses to which an accused is pleading guilty. Such a stipulation was provided in this case, but it does nothing to clarify the confusion surrounding the "mechanics" of this particular offense:

On 31 May 1990, [a bank employee] contacted [military police investigators] indicating that the accused had used his Check Smart Card. He had used it to pay for food, drinks, phone calls and lodging during his stay at the Belvedere Hotel, in Baltimore, Maryland from 4 May to 7 May 1990, at a cost of $636.27.

The difficulty here relates to the very first element of the offense; namely, that Phrampus did "make and utter" a "check" in the amount of $636.27. The scant facts contained in the stipulation, together with the disjointed colloquy during the providence inquiry, are simply insufficient to establish this critical element. We are left guessing just exactly how (indeed, *if*) Phrampus paid, or purported to pay, for his food, lodging, etc. at the Hotel Belvedere. We cannot discern, for instance, whether he paid for each meal, drink, phone call, etc. separately with his Check Smart Card, or waited until the final day and paid a consolidated bill. In one breath, he indicates that he signed "just like a credit card slip" on meals and such, but in the next breath he leaves the impression that what he was actually signing was a bill for the meal, charging it to his room.

When asked to explain in general terms how the card is used, Phrampus couldn't even state with any certainty whether or not he ever had to sign anything when affecting a transaction. In this same vein, while he was willing to accept as accurate the $636.27 total dollar amount alleged in this specification, he didn't recall signing (or even seeing) a final bill for that amount. In fact, it is with an unusual degree of certainty that he stated "No, Your Honor, I never totaled up a bill, Your Honor. I left that morning."

Did he pay day-by-day, meal-by-meal, with his debit card? Or did he charge all these items to his room, to be paid in a final tally at his departure? Did he sign a debit slip of some kind at his departure? Or did he perhaps run up the tally and leave, wittingly or unwittingly, without actually paying? Or did he sign something when he first registered, authorizing the hotel to tally his charges during his stay without the need for a final signature? If he did sign something in any one of these scenarios, what was it he signed and what legal effect did it have? Having been referred to in the specification as a "check", what relationship did it bear to more traditional check writing? If he did not sign anything, was there perhaps a licensing agreement associated with the debit card whereby presentation of the card, with the entry of a personal identification number and without signature, was sufficient to impose a legal liability? And if so, or if he should have signed but simply didn't, was the ensuing offense actually a larceny in violation of Article 121, 10 U.S.C. § 921 instead of a "bad check" in violation of Article 123a?

We note, with some dismay, the conspicuous absence of two exhibits which might have answered many of these questions and clarified the events which Phrampus is seemingly unable to recount—first, the credit card slip or other writing which purports to constitute a "check, draft, or order for the payment of money" in the amount of $636.27 [2]; and second, a licensing agreement governing the use of the debit card. Without these, and without an effective

---

2. Our review of the record of trial included a review of the exhibits from the Article 32 investigation. While one of the exhibits in that investigation contains documentation purportedly reflecting Check Smart Card transactions, includ-

ing an entry for $636.27 at the Belvedere Hotel, there is no evidence of a signed debit card slip or any other transaction slip reflecting that amount. Furthermore, although the allied papers include a pretrial advice which references

stipulation to substitute for their absence, we are unable to assess not only the providence of Phrampus' plea, but also the suitability of charging this debit card offense under Article 123a.[3]

Clearly, Phrampus believed he had committed the offense and wanted to plead guilty to it. However, a guilty plea may not be accepted unless it has an established factual basis. R.C.M. 910(e); *United States v. Care*, 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969). The fact that the accused concludes that he is guilty is not sufficient, in and of itself, to establish the necessary factual basis. The factual circumstances revealed by the accused during the inquiry must objectively support the plea. *United States v. Davenport*, 9 M.J. 364 (C.M.A.1980). If the accused raises a matter inconsistent with his plea of guilty, the inconsistency must be resolved or the military judge may not accept the plea. Article 45(a), 10 U.S.C. § 845; *United States v. Jemmings*, 1 M.J. 414 (C.M.A. 1976). The inconsistency, of course, must present more than just a possibility of a conflict. *United States v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1 (1973). Here, the inconsistency undermines the establishment of the first element of the offense; namely, whether the accused actually made or uttered the "check" which is the gravamen of the offense.

Our close examination of this issue causes us to conclude that neither the providence inquiry nor the stipulation of fact, nor the combination of the two, provides sufficiently certain facts from which the military judge could properly assess Phrampus' guilt of the particular offense charged and accept his guilty plea thereto. Accordingly, we find the plea to this offense (Third Additional Charge I) to have been improvident, and we set it aside. In the interest of judicial economy, the Third Additional Charge I and its specification are dismissed.

We reassess the sentence and approve only so much thereof as provides for a bad conduct discharge, confinement for 20 months, total forfeitures and reduction to E-1. In doing so, we are confident in our determination that the sentencing authority below would, in the absence of the dismissed charge, have adjudged a sentence no less than that which we announce above. *United States v. Peoples*, 29 M.J. 426 (C.M.A.1990); *United States v. Sales*, 22 M.J. 305 (C.M.A.1986). Further, in fulfillment of our independent responsibility to assess sentence appropriateness, we find this sentence to be entirely appropriate for the remaining offenses of which the appellant was convicted. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

The findings and sentence, as modified herein above, are

AFFIRMED.

Chief Judge O'BRIEN and Judge McLAUTHLIN concur.

a receipt for the use of Phrampus' Check Smart Card at the Hotel Belvedere, there is no evidence of such a receipt anywhere in the record of trial or allied papers. Thus, even if we look beyond the providence inquiry to seek resolution of this issue, we are left unsatisfied. *See United States v. Turner*, 11 M.J. 784, 788 n. 3 (A.C.M.R.1981). *But see United States v. Davenport*, 9 M.J. 364 (C.M.A.1980).

3. This issue concerning the charging of a debit card offense under Article 123a, UCMJ, appears to be a matter of first impression. While we are not able to squarely address the issue in this case, we note that the language of Article 123a is broad enough to encompass "any check, draft, or order for the payment of money." Thus, Article 123a has room to accept a variety of payment mechanisms. However, the issue will be difficult to resolve without specific information concerning the precise characteristics of the mechanism and the established procedures for its authorized use. As to debit cards, for example, there is more than one type. So-called "on-line" debit cards provide immediate access to the user's account (e.g., automatic teller machine cards), while "off-line" debit cards act more like credit cards in the sense that charges are accumulated and submitted by the payee in a batch. Note, *Consumer Protection and Payment Systems: Regulatory Policy For The Technological Era*, 98 Harv.L.Rev. 1870, 1875 n. 32 (1985). Without knowing the precise characteristics of the mechanism involved, it will be impossible to assess whether it falls within the purview of Article 123a.