# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
## Washington, D.C.

## UNITED STATES

### v.

## Julian R. YANGER
### Electrician's Mate Third Class (E-4), U.S. Coast Guard

## CGCMG 0222

## Docket No. 1271

## 21 March 2008

General Court-Martial convened by Commander, Maintenance and Logistics Command Atlantic. Tried at Norfolk, Virginia, on 26 May 2006.

| | |
|---|---|
| Military Judge: | CAPT Brian M. Judge, USCG |
| Trial Counsel: | LT Anthony S. Simpson, USCGR |
| Assistant Trial Counsel: | LCDR Patrick M. Flynn, USCG |
| Defense Counsel: | LT Peter P. Pascucci, JAGC, USNR |
| Assistant Defense Counsel: | LT Craig M. Warner, JAGC, USNR |
| Appellate Defense Counsel: | LCDR Nancy J. Truax, USCG[1] |
| | LT Robert M. Pirone, USCGR[2] |
| Assistant Appellate Defense Counsel: | LCDR Necia L. Chambliss, USCGR[3] |
| Appellate Government Counsel: | LCDR Patrick M. Flynn, USCG |

### BEFORE
### McCLELLAND, FELICETTI & LODGE
Appellate Military Judges

McCLELLAND, Chief Judge:

Appellant was tried by general court-martial, military judge alone. Pursuant to his pleas of guilty, entered in accordance with a pretrial agreement, Appellant was convicted of one specification of wrongfully using cocaine, in violation of Article 112a, Uniform Code of Military Justice (UCMJ); and one specification of involuntary manslaughter, in violation of Article 119, UCMJ. The military judge sentenced Appellant to reduction to E-1, forfeiture of all pay and

---

[1] LCDR Truax filed the briefs and remained as lead appellate defense counsel until 13 August 2007, at which time she became assistant appellate defense counsel and remained as such until she departed on terminal leave.

[2] LT Pirone was designated as lead appellate defense counsel on 13 August 2007.

[3] LCDR Chambliss was designated as assistant appellate defense counsel on 13 August 2007.

allowances, confinement for six years, and a dishonorable discharge. The Convening Authority approved the sentence as adjudged and suspended the execution of confinement in excess of forty-three months for eighteen months from the date the accused is released from confinement, pursuant to the terms of the pretrial agreement. The Convening Authority also credited Appellant with 105 days of pretrial confinement pursuant to *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984).

Before this Court, Appellant has assigned two errors: (1) Appellant's plea to involuntary manslaughter is improvident because the military judge failed to define the defense of self-defense and failed to explain the concepts of proximate cause and contributory negligence, and (2) Appellant is entitled to six additional days of credit for time spent in civilian confinement pursuant to *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984).

We reverse, agreeing that the military judge should have explained the defense of self-defense during the providence inquiry. We also discuss the issue of credit for civilian confinement.

### The Defense of Self-Defense

Appellant was convicted of involuntary manslaughter of his wife, Jennis Carter, in the culmination of an altercation with her, after they met in their separate vehicles at the entrance to a trailer park. Also in Appellant's vehicle were his wife's brother, Michael Carter, and the brother's girlfriend, Ms. Robbins. The following text from Prosecution Exhibit 1, a stipulation of fact, supplemented by the inquiry on the stipulation in italics, gives the essential details:

> 19. Ms. Carter exited her vehicle with a piece of crystal stemware in her hand. Ms. Carter had recently purchased a pair [sic] crystal glasses to give to EM3 Yanger for their up coming [sic] anniversary. Ms. Carter broke the stemware on the door in the vicinity of the partially lowered window of EM3 Yanger's car above where EM3 Yanger was seated.
>
> *MJ: All right. Where were you seated in the car?*
>
> *ACC: In – in the back seat behind the driver's side.*

*MJ: Okay. And when it says that she broke the stemware on the door, did she break it intentionally or accidentally or do you have any idea?*

*ACC: Intentionally, sir.*

*MJ: Okay. When – when she broke the stemware, did you think that she was threatening you in some way?*

*ACC: No, sir.*

*MJ: She was just angry?*

*ACC: Yes, sir. (R. at 56-57.)*

20. Ms. Carter was yelling at EM3 Yanger to "get out of the car" and to "come home."

21. EM3 Yanger continued to sit in the backseat of his car with his window partially rolled down. Ms. Carter approached, with the now broken stemware in her hand and pointed it at EM3 Yanger and said, "Julian, this has got to stop."

22. Ms. Carter stepped back from the car and said she was going to call EM3 Yanger's boat and tell them about his crack cocaine use. Prior to the threat to call the command EM3 Yanger had been calm. In response to the threat to call his command and after prodding by Mike Carter to "handle his wife," EM3 Yanger stepped out of his car. He approached his wife and she again threatened to call his command.

23. EM3 Yanger and Ms. Carter began to argue. Ms. Carter was heard to say, "Just get in the car, let's go home." EM3 Yanger told Ms. Carter that she was not going to call his boat and told her to chill out. Both EM3 Yanger and Ms. Carter were yelling.

24. This verbal altercation lasted approximately 30 seconds, after which EM3 Yanger grabbed the cell phone from Ms. Carter. In grabbing the cell phone EM3 Yanger was cut on the finger by the remnants of the stemware that Ms. Carter was holding. EM3 Yanger said, "Damn, Jenny, you cut me." Ms. Carter stated, "Don't put your hands on me." EM3 Yanger then turned and threw Ms. Carter's cell phone on the ground breaking it into a number of pieces.

*MJ: Now, you were cut there because you were grabbing the cell phone, not because she stabbed you in any way, right?*

*ACC: I – I cut myself grabbing for the phone, sir.*

*MJ: Okay. So, it was just an accident?*

*ACC: Yes, sir. (R. at 58-59.)*

25. EM3 Yanger and Ms. Carter began to argue again, more vociferously than before. EM3 Yanger was heard saying that it would be okay and telling Ms. Carter to go to the trailer.

26. Ms. Carter approached EM3 Yanger, angrily with shoulders hunched, still holding the remains of the stemware in her right hand. Ms. Carter was not observed pointing, jabbing, or threatening EM3 Yanger with the remains of the stemware. Ms. Carter was in EM3 Yanger's face at that point. They argued briefly at a very close distance. Both moved their arms back and forth.

*MJ: Now, do you agree that you didn't feel threatened by her at this point?*

*ACC: I was not threatened, sir.*

*MJ: And when it says you were moving your arms back and forth, was that just the way people move their hands sometimes when they're talking?*

*ACC: Body language, sir. (R. at 60.)*

27. After a few seconds of arguing like this, EM3 Yanger grabbed Ms. Carter by her wrists, her right hand still holding the remains of the stemware, and with substantial force shoved Ms. Carter away from him. The force from the shoving caused Ms. Carter to stumble backwards several feet and caused her glasses to fall off her face and break. The stem in her right hand plunged into her neck at the base of her neck line, creating a two inch stab wound. EM3 Yanger never grabbed the stem nor specifically attempted to plunge the stem into Ms. Carter's neck or chest. She remained standing between the cars for several seconds.

28. Ms. Robbins looked at Ms. Carter from inside the car and realized she was bleeding profusely from her neck. Ms. Robbins, and Michael Carter exited EM3 Yanger's vehicle and attempted to render aid. EM3 Yanger, upon realizing Ms. Carter was bleeding rushed to her side to assist her. Ms. Carter fell to the ground. 911 was called. EM3 Yanger and Mike Carter attempted to put Ms. Carter in the car to go to a hospital but they could not lift her. Paramedics arrived on the scene. Ms. Carter was declared dead at 12:19 a.m. on 4 February 2005 by emergency medical personnel.

29. The autopsy report of Ms. Carter's body states that the cause of death was the single stab wound to her neck. The stem from crystal stemware cut through the "soft tissues of the neck, near transaction of the right subclavian artery, pleura, and barely into the apex of the right upper lobe of the lung." The depth of the wound was approximately two inches. The medical examiner has stated that the injury could only be caused by substantial force. . . .

4

30. EM3 Yanger was not acting in self-defense when he shoved Ms. Carter and caused the stem in her hand to puncture her neck. . . .[4]

Following the inquiry on the stipulation, the military judge recited to Appellant the elements of the offense of involuntary manslaughter and relevant definitions (R. at 69-70), obtained his acknowledgment that he understood them, and then asked a few more questions, including the following:

MJ:  Why did you shove her?

ACC:  In – in the situation I was in, sir, I just wanted – I just wanted her out of my face with the glass.

MJ:  When you say you wanted her out of your face with the glass, you mean you just wanted her to get away from you.  Is that –

ACC:  Yes, sir.

MJ:  – what you're saying?

ACC:  Yes, sir.

MJ:  Did you think at that point that – that she was threatening you in any way?

ACC:  No, sir.

MJ:  Were you scared?

ACC:  No, sir.

MJ:  Did you think that she might use the stemware against Michael Carter or his girlfriend?

ACC:  No, sir.

MJ:  So, in no way did you think that you were acting in self-defense when you pushed her away from you?

ACC:  No, sir.

(R. at 72.)

---

[4] The military judge read the stipulation of fact to Appellant paragraph by paragraph and obtained his confirmation of each one, in addition to asking questions after some paragraphs as set forth above.

To plead guilty, an accused must believe and admit every element of the offense, and must believe and admit that there is no available defense. *United States v. Whiteside*, 59 M.J. 903, 906 (C.G.Ct.Crim.App. 2004). If an accused, having pled guilty, makes a statement during the providence inquiry that raises a potential defense, "the military judge should explain such a defense to the accused and should not accept the plea unless the accused admits facts which negate the defense." Rule for Courts-Martial (R.C.M.) 910(e) Discussion, Manual for Courts-Martial, United States (2005 ed.).

R.C.M. 916(e) sets forth the defense of self-defense in various circumstances. Most relevant to our case is R.C.M. 916(e)(3), which provides:

> It is a defense to any assault punishable under Article 90, 91, or 128 and not listed in subsections (e)(1) or (2) of this rule that the accused:
> (A) Apprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully on the accused; and
> (B) Believed that the force that accused used was necessary for protection against bodily harm, provided that the force used by the accused was less than force reasonably likely to produce death or grievous bodily harm.[5]

It might be said by an incurious person that the story according to the stipulation of fact, as amplified by the military judge's questions during the inquiry on it, did not raise the defense of self-defense. But the story did beg the question: why did Appellant shove his wife? Was he escalating the altercation, or was he responding to her? A military judge, in dealing with a guilty plea, cannot be passive or incurious. In this case, the military judge wisely asked the question, and the answer, "I just wanted her out of my face with the glass" (R. at 72), sets off alarm bells. Surely it implied that the glass represented a threat. This implication conflicted with all his answers, both before and after, indicating that he did not feel physically threatened by the glass or otherwise.

We note that the stipulation of fact and the providence inquiry are replete with statements, details, and questions that address the possibility of self-defense. Hence it is clear that the parties and the military judge viewed the issue of self-defense as lingering at the fringes

---

[5] Notwithstanding the limitation in this provision's first clause, it could apply to the facts of the present case in conjunction with the defense of accident, as explained in the Discussion.

of the case. In this context, it would be surprising if the military judge did not consider that the potential defense of self-defense had been raised, yet he did not follow through as that view would require.

Whether the military judge thought so or not, we find that the defense was raised. He should have explained the defense to Appellant and determined whether Appellant, understanding that potential defense, believed that he had not, in the words of R.C.M. 916(e)(3), "[a]pprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully" on himself.

Arguably Appellant admitted such a belief by denying that he felt threatened. His response, however, was ambiguous. What was his definition of the term "threat"? Two possible definitions would have fit the context: (1) an expression of an intention to inflict pain, injury, evil, or punishment, or (2) an indication of impending danger or harm. American Heritage Desk Dictionary (4th ed. 2000). Using the first definition, Appellant may only have meant that he did not attribute to his wife an intention to inflict injury. This might bear on the reasonableness of an apprehension that harm is about to be inflicted, but not to the exclusion of other factors, so its negation would not constitute an admission that the defense was absent. If Appellant adhered strictly to the second definition, his denial that he felt threatened would mean he had *no* indication (apprehension) of impending harm, but he may have meant merely that he did not apprehend that *serious* injury was about to be inflicted, even though reasonable apprehension of a minor injury would be sufficient to establish the defense.

Given these ambiguities, we cannot say that the record shows an adequate substitute for explaining the defense. His admission did not itself clearly negate the defense, and cannot be credited as negating the defense when the defense had not been explained to him. *United States v. Jemmings*, 1 M.J. 414, 418 (C.M.A. 1976); *United States v. Smith*, 44 M.J. 387, 392 (C.A.A.F. 1996); *United States v. Biscoe*, 47 M.J. 398, 402 (C.A.A.F. 1998); *United States v. Zachary*, 63 M.J. 438, 444 (C.A.A.F. 2006); *Whiteside*, 59 M.J. at 905.[6]

---

[6] Although *United States v. Smith*, 44 M.J. 387, 392 (C.A.A.F. 1996), implies that a conviction upon a guilty plea can be affirmed without a full explanation of a defense that has been raised, the sequence of offensive touchings in that case included some "that do not even implicate the appellate-raised defenses noted above," *id.* at 393.

Appellant also argues that the military judge should have explained the concepts of proximate cause and contributory negligence to Appellant. We do not think the case raises an issue implicating these concepts. However, the unresolved self-defense issue compels us to set aside the involuntary manslaughter conviction.

## Credit for Civilian Confinement

Appellant contends that he is entitled to credit for six days spent in civilian confinement between the charged offenses and his trial. This issue was never mentioned at trial. In view of our holding on the first assignment of error, we do not decide the issue, but we discuss it to provide points of reference for use on remand.

We first note that we do not view the claim for credit as waived by the failure to raise it at trial. It is the convening authority's responsibility to ensure that credit for pretrial confinement is applied, *United States v. Minyen*, 57 M.J. 804, 806 (C.G.Ct.Crim.App. 2002), although the military judge is normally expected to determine the amount of the credit, *United States v. Gunderson*, 54 M.J. 593, 594 (C.G.Ct.Crim.App. 2000). Hence it is clear that a claim for credit is not untimely if submitted to the convening authority after trial. In *United States v. Tardif*, 55 M.J. 670 (C.G.Ct.Crim.App. 2001), this Court entertained a claim for credit made for the first time upon request for reconsideration of our previously-issued decision under Article 66, UCMJ. *Allen* credit has been called "administrative ramifications of pretrial confinement." *United States v. Balboa*, 33 M.J. 304, 306 (C.M.A. 1991). We see no reason to preclude consideration of the issue so long as Appellant remains confined so that credit has not been mooted.

Charges against Appellant under Articles 86 and 112a, UCMJ, were initially preferred on 23 March 2005. These charges were withdrawn and dismissed on 14 July 2005. New charges against Appellant under Articles 86, 112a, and 119, UCMJ, were preferred on 26 September 2005, alleging offenses on or before 16 March 2005.

According to his post-trial affidavit attached to the record upon his motion, Appellant was arrested by the Hampton, Virginia police on Wednesday, 24 August 2005, for felony hit-and-run. He was brought before a magistrate, who determined that he should not be released.

After six days of confinement, he went before a judge. The prosecutor argued that he should remain in confinement because the Coast Guard was seeking indictment on a murder charge. The judge nevertheless ordered his release.

Also attached to the record upon Appellant's motion is a document labeled as "Worksheet from Appellant's Initial Bond Hearing." It appears to be guidance or a memory aid for the magistrate or judge concerning standards for holding a suspect. At the top, Appellant's name is handwritten. The bottom half of the page is printed with blank lines headed "Additional information." On these lines is handwritten the following text: "Please Do not Release on Bond – The Coast Guard Military Jag Office is going to Charge Mr. Yanger with Murder of His Wife – per Officer Fredricks of our Police Department – The Warrants from the Federal Office should be done by No later than Friday!!!" This is followed by a signature, which appears to be Mag Harris or May Harris. Appellant's counsel avers that this document was obtained from the file at the Hampton General District Court, calling it "the worksheet provided to the magistrate at Appellant's bond hearing." (Appellant's Br. 11 n.3.)

Counsel also avers, "The state of Virginia ultimately did not prosecute Appellant for hit-and-run, and Appellant pleaded guilty to reckless driving and received a completely suspended sentence." (Appellant's Br. 11.) No evidence is provided to support this averment, other than the statement that "undersigned counsel has ascertained from Appellant's public defender that the state charge of felony hit-and-run was dropped, and Appellant pleaded guilty to the state reckless driving charge; Appellant received a completely suspended sentence, to which no credit was applied." *Id.* at 13.

*United States v. Allen*, 17 M.J. 126 (C.M.A. 1984), held that Department of Defense (DoD) Instruction 1325.4 dated October 7, 1968, required credit for pretrial confinement against any sentence to confinement, as provided for civilian federal prisoners by 18 U.S.C. 3568.[7] The current DoD directive, containing essentially the same provision in paragraph 6.3.1.5. as that

---

[7] The *Allen* holding has been consistently applied to Coast Guard cases even though the Coast Guard is not part of the Department of Defense. This is inevitable given that the Coast Guard confines its prisoners in Department of Defense facilities. Accordingly, it is firmly embedded in Coast Guard practice. *See, e.g.,* Enclosures 8a, 8b, 18a of COMDTINST M5810.1D, Military Justice Manual, dated 17 August 2000.

relied on by the court in *Allen*, is DoD Instruction 1325.7 dated 17 July 2001. The corresponding federal statute is now 18 U.S.C. 3585(b), which provides:

> **Credit for Prior Custody.—** A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
> (1) as a result of the offense for which the sentence was imposed; or
> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
>
> that has not been credited against another sentence.

Appellant urges that he is due credit under either (1) or (2) of 18 U.S.C. 3585(b). The evidence he has provided is insufficient to establish his entitlement to credit, but if counsel's averments are true, it appears that Appellant is, indeed, due credit under (2) of 18 U.S.C. 3585(b). On remand, the record should be more fully developed to decide this question. Indeed, a convening authority should address such a question at any time it is brought to his or her attention; there is no requirement for our involvement.

## Decision

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the finding of guilty of using cocaine, in violation of Article 112a, UCMJ, is determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, that finding is affirmed. The finding of guilty of Charge III, involuntary manslaughter, in violation of Article 119, UCMJ, is set aside. The record is returned to the Judge Advocate General for referral to an appropriate convening authority. The convening authority may order a rehearing. If the convening authority determines that a rehearing is impracticable, the convening authority may approve a sentence of no punishment for the affirmed finding of guilty.

Judge FELICETTI concurs.

LODGE, Judge (concurring in part and dissenting in part):

I concur in the majority's treatment of Assignment II, as well as the summary disposition of Assignment I dealing with proximate cause and contributory negligence. I would find, however, that Appellant's plea to involuntary manslaughter is provident, and affirm.

To plead guilty, an accused must believe and admit every element of the offense, and must believe and admit that there is no available defense. *United States v. Whiteside*, 59 M.J. 903, 906 (C.G.Ct.Crim.App. 2004). If an accused, having pled guilty, makes a statement during the providence inquiry that raises a potential defense, "the military judge should explain such a defense to the accused and should not accept the plea unless the accused admits facts which negate the defense." Rule for Courts-Martial (R.C.M.) 910(e) Discussion, Manual for Courts-Martial, United States (2005 ed.). A plea of guilty, however, should not be set aside on appeal unless there is a substantial basis in law or fact for questioning the plea. *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991).

The majority painstakingly examines the record of trial to demonstrate that, because it was not fully explained by the military judge, Appellant did not fully understand the legal subtleties of the possible defense of self-defense as defined in R.C.M. 916(e)(3), which provides:

> It is a defense to any assault punishable under Article 90, 91, or 128 and not listed in subsections (e)(1) or (2) of this rule that the accused:
> (A) Apprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully on the accused; and
> (B) Believed that the force that accused used was necessary for protection against bodily harm, provided that the force used by the accused was less than force reasonably likely to produce death or grievous bodily harm.

I believe, however, that the majority places too much emphasis on the premise that Appellant's actions in shoving his wife could have been a result of some unarticulated fear of the glass or otherwise.

The military judge, recognizing the possibility of a claim of self-defense, asked Appellant if he felt threatened, and Appellant responded in the negative, instead providing the military judge with a valid rationale for his actions ("I just wanted her out of my face with the glass.").

(R. at 72.)  Instead of demanding perfection from the military judge, Appellant's responses to the military judge's questions, along with the stipulation of fact, adequately demonstrate that the defense of self-defense, while raised, was not available to Appellant.

In order for Appellant to take advantage of the defense of self-defense, he must have had a reasonable belief that bodily harm was about to be inflicted upon himself, and that the force he used was necessary to protect himself.  After the dialogue between the military judge and Appellant into the justification for Appellant shoving his wife, the military judge further questioned Appellant to rule out self-defense.  In response to questioning by the military judge, Appellant admitted that his wife was not threatening him or another person, and that he was not scared.  (R. at 72.)  It is clear that Appellant could not avail himself of the defense of self-defense because he did not believe he needed protection from his wife.

I would therefore find Appellant's plea provident and affirm.



For the Court,

Jane R. Lim
Clerk of the Court