**UNITED STATES, Appellee,**

v.

**Jolene R. DEHART, Specialist, U.S. Army, Appellant.**

No. 64,276.
CM 8801416.

U.S. Court of Military Appeals.

Argued Feb. 12, 1991.

Decided Sept. 4, 1991.

For Appellant: *Captain Michael J. Berrigan* (argued); *Lieutenant Colonel Russell S. Estey* and *Major Michael J. Kelleher* (on brief); *Colonel Robert B. Kirby.*

For Appellee: *Captain Jonathan F. Potter* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Randy V. Cargill* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

Appellant was tried by a general court-martial which included enlisted members at Hanau and Frankfurt, Federal Republic of Germany, during June of 1988. Contrary to her pleas, she was convicted of two specifications of violating a general regulation by importing lysergic acid diethylamide (LSD) into Germany; a single specification of possessing LSD; and two specifications of distributing LSD, in violation of Articles 92 and 112a, Uniform Code of Military Justice, 10 USC §§ 892 and 912a, respectively. She was sentenced to a dishonorable discharge, confinement for 15 years, total forfeitures, and reduction to Private E1. The convening authority approved the sentence but reduced the period of confinement to 13 years. On October 30, 1989, the Court of Military Review dismissed the two specifications of importing LSD, reduced the period of confinement to 8 years, but otherwise affirmed in an unpublished opinion.

On September 4, 1990, this Court granted review on the following issues:

## I

WHETHER APPELLANT ESTABLISHED, AS A MATTER OF LAW, THE DEFENSE OF DURESS AS TO THE DRUG CHARGE AND ITS SPECIFICATIONS.

## II

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE REFUSED TO ORDER THE GOVERNMENT TO MAKE ADDITIONAL EFFORTS TO OBTAIN THE PERSONAL APPEARANCE OF TROY PEARSON AND OCEAN GREGORY AFTER HE FOUND THEIR TESTIMONY TO BE MATERIAL TO APPELLANT'S DEFENSE.

We hold that appellant's duress defense was properly considered and rejected by the members at this court-martial. *United States v. Williams*, 21 MJ 360 (CMA 1986); see *United States v. Charleus*, 871 F.2d 265, 269–70 (2d Cir.1989). *Cf. United States v. Bailey*, 444 U.S. 394, 415–16, 100 S.Ct. 624, 637–38, 62 L.Ed.2d 575 (1980). We also hold that no prejudicial error occurred as a result of the military judge's failure to take additional steps to secure the presence of the two defense-requested witnesses at appellant's court-martial. *United States v. Davis*, 29 MJ 357 (CMA 1990).

The record of trial contains the following evidence concerning the granted issues: Specialist Jolene DeHart testified that she met Private Troy Pearson on Christmas day of 1986. She went on dates with him several times during the next few weeks but told him that she wanted to break off the relationship in early February 1987, when she found out that he was involved with drugs. He told her that he wanted to continue the relationship and "promised" to "give up the drugs." Nevertheless, appellant began dating another soldier, Private Mark Kruse, in the middle of March.

According to appellant's testimony, Pearson was very disturbed about her dating Kruse and came to her apartment numerous times during March and April. Several times he came over to her apartment early in the morning, and once he climbed over her balcony and banged on her porch windows. However, through appellant's 13-year-old daughter, Ocean Gregory, appellant discovered that Pearson had also come over to her apartment twice at about 4 and 5 o'clock in the afternoon. Recalling the incident, appellant testified, "One time he gave her hash and the other time he gave her two hits of LSD. He tried to talk her into taking some, getting her friends involved and doing drugs. And later on that evening she gave the drugs to me and told me about what had happened."

Concerned with these events, appellant "wrote an anonymous note to" her commander, Captain Browning, which advised him of "a severe" drug problem in the company, and included several names and the two hits of LSD that Pearson had allegedly given to Ocean. In his earlier testimo-

ny at this court-martial, Captain Browning confirmed having received the note.

In April of 1987, Pearson approached appellant, who was a clerk in the unit's orderly room, and asked her to prepare false border passes for himself and a Private Bearnson in exchange for $50. She told Captain Browning and revealed to him that she had authored the earlier anonymous note. He told her that "he would contact" the Criminal Investigation Command (CID) and refrain from mentioning her name. After consulting the CID, he told appellant to prepare the passes Pearson had requested. Both appellant and Captain Browning testified that they thought the CID intended to apprehend Pearson at the Dutch border. However, according to their testimony, no drugs were found on Pearson when he was stopped. Captain Browning testified that he suspected Pearson had been tipped off about the search.

In May 1987, appellant, at the request of the CID, gave a statement connecting Pearson and others with drugs. She was promised that her statement would remain anonymous. Later, around the beginning of July, Private Deron Hagopian showed appellant a copy of the statement she made to the CID. He told her that he had distributed copies of her statement to others in the drug ring and that she would "suffer for what" she had done. Appellant advised Captain Browning. He contacted the CID and steps were taken to stop these threats by Hagopian.

Hagopian testified that he had received appellant's CID statement from Pearson. He also testified that Pearson had told him that he wanted "to get back at" appellant for the border search "and physically hurt her." After the first threats were communicated, appellant's testimony indicates that she and Ocean started to receive threatening telephone calls. In one call that Ocean received, the caller said that appellant "was a narc and that her mother was going to get killed for being a narc." Once Ocean was told "that narcs' kids get hurt." Appellant told Captain Browning

about the calls and sent Ocean back to the United States to ensure her safety.

In mid-July Hagopian again approached appellant and suggested "a deal" whereby she would purchase drugs in Amsterdam and carry them back to Germany for distribution. In return, the threats would stop. She agreed to participate. Hagopian was tried in September 1987 and then left the country. Appellant testified that in September, she came home to find Pearson in her apartment. When appellant said she would call the police, he "grabbed" her by the hair and said he would throw her off the balcony if she called. Pearson also told her that he knew where Ocean was in Florida. He warned her that "he had friends there" and that Ocean "could wind up getting a massive [over]dose of drugs at school."

Appellant testified that, during the third week in September, Pearson, who was soon to be administratively discharged from the Army, introduced her to Specialist Anthony Dick. He told her she would bring back drugs from Amsterdam for Dick. She also testified that in the third week of October, she was contacted by her mother, who was caring for Ocean, and told that Ocean had been given drugs at school. She believed that Pearson had instigated that incident.

Appellant admitted that she went to Amsterdam on October 31 and returned with 100 "hits" of LSD. Pearson left Germany at about the same time. She passed the LSD to Dick when she returned. Appellant also admitted that on February 13, 1988, she made a second trip to Amsterdam at Dick's request and delivered 200 units of LSD to him on February 14, 1988, keeping 5 "hits" in her nightstand. She explained that she kept those 5 units so that if Dick counted his buy and found it to be short, she could provide him with the extras. Her testimony indicates that Dick paid her $600 in advance for the drugs she acquired from that trip.

SPC Dick also testified. He said that Pearson encouraged him to sell LSD "to make some quick money" to help pay for his upcoming marriage. He said that he

first met Specialist DeHart in September when, as he claimed, Pearson introduced her to him so he could buy LSD. Dick testified that he "bought 60 hits of LSD" from appellant during that first meeting, and he described her as "[v]ery calm; very cool, so to speak; carefree; business like, so to speak on this type of business." He also asked appellant about whether he could buy from her in the future. According to Dick, she responded that "it would be all right" and that "she usually goes around paydays." Dick claimed to have bought LSD from appellant on "[f]ive or six" occasions between September 1987 and the end of that year at a minimum price of $3 per dose unit. His testimony also indicated that appellant traveled to Amsterdam to purchase the drugs.

There was also testimony from PFC Lee Ryan, who had acted as an undercover agent. Ryan testified that on February 14, 1988, he purchased 200 units of LSD from appellant for $600. Ryan described appellant as "very relaxed" and recalled how appellant was unflustered by an encounter with other soldiers while the transaction was being conducted. Ryan also testified that appellant had indicated to him that "she would probably be going to Amsterdam later that month" to purchase more drugs.

The Court of Military Review set aside both specifications of importing under Charge I. Appellant remains convicted of specifications 1, 3, and 4 of Charge II, which state:

Specification 1: In that [appellant] did, at Kesselstadt, Federal Republic of Germany, on or about 18 March 1988, wrongfully possess five dose units of Lysergic Acid Diethylamide, a controlled substance.

\*    \*    \*    \*    \*    \*

Specification 3: In that [appellant] did, at Pioneer Kaserne, Hanau, Federal Republic of Germany, on or about 14 February 1988, wrongfully distribute 200 dose units of Lysergic Acid Diethylamide, a controlled substance.

Specification 4: In that [appellant] did, at Hanau, Federal Republic of Germany, from August 1987 to December 1987, wrongfully distribute 100 dose units of Lysergic Acid Diethylamide, a controlled substance.

In their finding as to specification 4, the members reduced the number of dose units sold to 100.

**I**

■ The defense of duress is well-established in military law. *See United States v. Palus*, 13 MJ 179 (CMA 1982); *United States v. Jemmings*, 1 MJ 414 (CMA 1976); *United States v. Pinkston*, 18 USCMA 261, 39 CMR 261 (1969); *United States v. Fleming*, 7 USCMA 543, 23 CMR 7 (1957). However, fear alone is not sufficient to constitute this defense. *See United States v. Jennell*, 749 F.2d 1302, 1305 (9th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985). Its more demanding requirements were recognized by this Court in *United States v. Roby*, 23 USCMA 295, 296, 49 CMR 544, 545 (1975), and found to be properly delineated in paragraph 216*f*, Manual for Courts–Martial, United States, 1969 (Revised edition).

This Manual provision stated:

Except when he kills an innocent person, a person cannot properly be convicted for committing an act for which he would otherwise be criminally responsible if his participation in it is *caused* by the degree of coercion or duress recognized in law as a defense. This degree of coercion or duress is a reasonably grounded fear on the part of the actor that he would be *immediately* killed or would *immediately* suffer serious bodily injury if he did not commit the act. The fear compelling the act must be of *immediate* death or serious bodily injury and not of an injury in the future or of an injury to reputation or property. *The threat must continue throughout the perpetration of the act.* If the accused has a reasonable opportunity to avoid committing the act without

subjecting himself to the threatened danger, his act is not excusable.

(Emphasis added.)

These same requirements are presently found in RCM 916(h), Manual for Courts–Martial, United States, 1984. *See United States v. Beltran–Rios,* 878 F.2d 1208, 1213 (9th Cir.1989); *United States v. Jennell, supra* at 1305; *United States v. Contento–Pachon,* 723 F.2d 691, 693 (9th Cir. 1984).

■ Appellant claims that the prosecution failed to prove beyond a reasonable doubt that the defense of duress did not exist in this case. *See* RCM 916(b). She particularly asserts that she introduced substantial evidence that she was forced to commit the charged drug offenses because of fear for her own life and safety and that of her daughter. *See* RCM 916(h). She also contends that "[t]he Government produced nothing to rebut this defense," and she argues that this defense must be considered "conclusively established" in her case. Accordingly, she concludes that her convictions must be set aside.

A similar appellate argument was addressed by this Court in *United States v. Williams,* 21 MJ 360 (CMA 1986), and rejected. There, we noted that "[w]hen a defense is reasonably raised by some evidence, it must be the subject of instruction if trial is by members, and the trier of fact must be convinced beyond a reasonable doubt that the 'defense does not exist.'" *Id.* at 362. We also held that a factfinder can reject such a defense on the basis of the credibility of the accused or other witness proffering the defense testimony. Accordingly, appellant's technical failure-to-rebut argument is not well taken as a matter of military or civilian jurisprudence. *See United States v. Charleus,* 871 F.2d at 269–70; *United States v. Falcon,* 766 F.2d 1469, 1477 (10th Cir.1985).

In this case there was also ample evidence in the record upon which a reasonable factfinder could reject beyond a reasonable doubt appellant's duress defense. (*See* appendix.) *Cf. Martin v. Ohio,* 480 U.S. 228, 235–36, 107 S.Ct. 1098, 1103, 94

L.Ed.2d 267 (1987). First, there was a real dispute in this case whether appellant's participation in these offenses was *caused* by the threats of Hagopian and Pearson. Evidence exists in this record that she may have been motivated by her financial problems and the profits derived from the charged transactions. Appellant, herself, admitted having such serious problems during the period and profiting from the drug deals. *See United States v. Bakhtiari,* 913 F.2d 1053, 1058 (2d Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); *United States v. Jacobs,* 704 F.Supp. 629, 631 (E.D.N.C.1988). Second, there was conflicting evidence as to whether the threats of Hagopian and Pearson *continued* through the 7–month period of her participation in these drug crimes. Evidence showed that Hagopian had left Germany during the second month of this period and Pearson had left during the fourth month of that period. Evidence also showed that appellant corresponded with Hagopian on a friendly basis after his departure and that they jointly owned savings bonds. *See also United States v. Gordon,* 526 F.2d 406, 408 (9th Cir.1975).

Finally, there was a major evidentiary dispute in this case as to whether appellant had a *reasonable opportunity to avoid* committing these acts without subjecting herself to danger. *See United States v. Contento–Pachon,* 723 F.2d at 694. She herself admitted that she did not go to military authorities about the specific threats to her from Hagopian in late July and those of Pearson in September. *See United States v. Lee,* 694 F.2d 649, 654 (11th Cir.), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983). Moreover, she admitted that she did not pursue her earlier complaints above the level of her company commander during this 7–month period. *United States v. Jennell,* 749 F.2d at 1306. *Cf. United States v. Jemmings,* 1 MJ at 418. Clearly, evidence existed in this case from which the factfinders could reject beyond a reasonable doubt appellant's duress defense. *See gen-*

*erally United States v. Bailey,* 444 U.S. at 412 n. 9, 100 S.Ct. at 635 n. 9.

## II

Appellant next complains that the military judge erred by failing to take additional steps to secure the appearance of two defense-requested witnesses. The first witness, Ocean Gregory, was appellant's daughter who resided in Florida in the custody of appellant's mother and sister. The second witness, Troy Pearson, was appellant's former boyfriend and purported intimidator who the defense was unable to personally locate or interview. The military judge ultimately failed to order the presence of either of these witnesses.

On appeal, appellant claims that these witnesses were "material" and that their appearance should have been secured by every reasonable measure available to the military judge. *See United States v. Burns,* 27 MJ 92, 97 (CMA 1988). She argues that, since every reasonable effort was not expended by the judge, the proceedings against her should have been dismissed. *United States v. Carpenter,* 1 MJ 384, 386 (CMA 1976). We disagree. *United States v. Davis,* 29 MJ 357 (CMA 1990).

■ Turning first to the Troy Pearson request, appellant asserts that the military judge erred by not finding that this ex-soldier was a material witness in her case. "Materiality of testimony ... depends on whether the testimony would 'negate the Government's evidence or ... support the defense.'" *United States v. Fisher,* 24 MJ 358, 361 (CMA 1987) (citations omitted); *see also United States v. Davis,* 29 MJ at 359. Here, the judge informed defense counsel of his inability to make such a determination on the basis of the defense's general proffer of relevance. He further requested that the latter make further efforts to contact this witness and ascertain the particulars of his expected testimony. *See United States v. Lucas,* 5 MJ 167, 172 (CMA 1978). No further motions by the defense were made with respect to this witness. In view of the extra-relevance standard noted above, we conclude that no

violation of Article 46, UCMJ, 10 USC § 846, or the Compulsory Process Clause, U.S. Const. amend. VI, occurred in this case. *See United States v. Davis, supra* at 359.

■ The failure to extract Ocean Gregory from Florida and to secure her presence in Germany for appellant's trial was also not prejudicial error. Admittedly, the judge found that she was a material witness and ordered her production. However, defense counsel later informed the court that this child's guardian would not accept invitational travel orders provided by the Government. Appellate defense counsel's contention that a military escort would change this predicament is somewhat speculative and provides no basis for finding fault with the judge. *See United States v. Hampton,* 33 MJ 21 (CMA 1991). This is especially so when the defense did not request such an escort at trial or otherwise request that the trial be continued or abated. *United States v. Davis, supra* at 360.

The decision of the United States Army Court of Military Review is affirmed.

Judge COX and Senior Judge EVERETT concur.

## APPENDIX

MJ: Now, to be taken in consideration with these elements of the offenses are two defenses. You've heard a substantial amount of information concerning them today. But here are the instructions on the law you must follow:

First of all, the defense of duress. It applies only to Charge I and its specification and Charge II and specifications 1, 3 and 4. Members of the court, the evidence has raised the issue of duress in relation to these offenses that I've just outlined for you. Now, I want you to take careful note of this. "Duress" means coercion or compulsion. It is causing another person to do something against his or her will by the use of either, 1, physical force; or 2, psychological coercion.

Now, there has been evidence in the form of testimony leading to this defense.

And I want to give you as a summary here the contentions by both parties, that is, the defense and the prosecution. First on behalf of the defense. First there is the accused's testimony to consider in view of this defense. She testified Troy Pearson unlawfully entered her house on several occasions and threatened her with serious bodily injury during the month of July 1987. She testified that Troy Pearson approached her at the Boat Pub and said, "You had better not be caught alone during July 1987." She testified that Troy Pearson said at the same time at the Boat Pub in July 1987 that he had the "power." The accused further testified that Troy Pearson approached her daughter and provided her daughter with illicit drugs during the month of July 1987, thus, reflecting his opportunity to obtain close proximity with her daughter. The accused testified that the accused considered Troy Pearson to be dangerous, especially after using illicit drugs. She further testified that in September 1987, Troy Pearson warned her to carry through with "the deal"; that he would not be as sympathetic as had been Deron Hagopian. The accused also testified that she received telephone calls which she considered threatening. Such telephone calls relating words to the effect that "the accused was a narc" and that "kids of narcs get hurt" in June 1987.

The accused further testified that her daughter, age 13, name[d] Ocean, received telephone calls while she resided in the Federal Republic of Germany by an anonymous individual saying, "Your mother is going to get killed" and further was questioned as to whether she, Ocean Gregory, was home alone-these phone calls taking place in the Federal Republic of Germany in June 1987.

Furthermore, the testimony of First Sergeant Cox that he was personally aware that the accused had been threatened in the month of July 1987 by individuals who were aware that the accused had provided information to agents of the Criminal Investigation Division [sic] regarding Troy Pearson.

Furthermore, the testimony of Captain Browning that he was aware that soldier Deron Hagopian had approached the accused about her providing information to the CID.

Further, testimony of Deron Hagopian regarding the character of Troy Pearson, his avowed intent to "get even" with the accused, which was relayed to the accused by Deron Hagopian along with information that Troy Pearson was an unstable and violent person.

Against this background the prosecution contends, and this also is in view of your considerations of the defense of coercion and duress, first that the accused is 32 years of age.

Second, that the accused has a GT score of 127.

Third, the accused's testimony that she informed no one in authority from July 1987 until March 1988 of any alleged threats.

Fourth, that the accused never mentioned to her fiance, Private E–2 Mark H. Cruz, that she had been threatened by any person.

Fifth, the testimony of Captain Browning, Sergeant Garrison and First Sergeant Cox that the accused never mentioned at any time threats against her made by a Troy Pearson.

Sixth, testimony of Deron Hagopian that he never threatened the accused.

Seventh, testimony of Captain Browning, Specialist Anthony Dick, and the accused that Troy Pearson departed the Federal Republic of Germany on or about 31 October 1987; and

Eighth, testimony of Deron Hagopian that he departed the Federal Republic of Germany in early September 1987.

Now, to be a defense the amount of duress used on the accused, whether physical or psychological, must have been sufficient to cause a reasonable fear that if she did not commit the offenses outlined in specifications 1 and 2 of Charge I; and 1, 3,

and 4 of Charge II, that she, that is, the accused or a member of the accused's immediate family would be killed or suffer serious bodily injury. The amount of coercion or force must have been sufficient to have caused a person of normal strength and courage to give in. The fear which caused the accused to commit the offenses must have been fear of death or serious bodily injury and not simply fear of injury to reputation or property. The threat and resulting fear must have continued throughout the commission of the offenses. If the accused had a reasonable chance to avoid committing the offenses without subjecting herself or members of her immediate family to the threatened danger, the defense of duress does not exist. You should consider here the opportunity or the lack of opportunity the accused may have had to report the threat to the authorities and whether the accused reasonably believed that a threat [sic] would protect her or her family from the threatened danger.

The burden is on the prosecution to establish the accused's guilt beyond a reasonable doubt. Duress is a complete defense to the offenses that they apply to, that I have instructed you upon. Consequently, if you are convinced beyond a reasonable doubt that the accused did not act under duress, the defense of duress does not exist.