UNITED STATES, Appellee,

v.

Sharon R. RANKINS, Specialist
U.S. Army, Appellant.

No. 67,069.

CM 9100083

U.S. Court of Military Appeals.

Argued Feb. 13, 1992.

Decided July 29, 1992.

For Appellant: *Captain Emmett G. Wells* (argued); *Lieutenant Colonel James H. Weise* and *Captain James M. Heaton* (on brief); *Colonel Robert B. Kirby.*

For Appellee: *Captain Steven M. Walters* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Major Timothy W. Lucas* (on brief).

*Opinion*

CRAWFORD, Judge:

Appellant was convicted, contrary to her pleas, of missing movement through design, in violation of Article 87, Uniform Code of Military Justice, 10 USC § 887. She was sentenced to a bad-conduct discharge and confinement for 30 days. The Court of Military Review affirmed the findings and the approved sentence. 32 MJ 971 (1991). This Court granted her petition for review on the following issue:

WHETHER THE MILITARY JUDGE ERRED BY REFUSING TO INSTRUCT

THE MEMBERS THAT DURESS WAS A DEFENSE TO MISSING MOVEMENT, WHERE APPELLANT TESTIFIED THAT SHE HAD MISSED MOVEMENT OUT OF FEAR THAT HER HUSBAND, WHO SUFFERED FROM A HEART CONDITION, WOULD HAVE A HEART ATTACK AT HOME IN HER ABSENCE WITHOUT ANYONE TO ASSIST HIM.

## I

Appellant and her husband were active-duty soldiers stationed at Fort Lewis, Washington. During the period of October 3–15, 1990, appellant was sent on a field exercise to Yakima Firing Center, while her husband remained at home. On the sixth day of that exercise, appellant learned that the wife of a soldier had died of a heart attack while that soldier was in the field. Appellant was told that the soldier's wife had been dead for 2 days and her baby was dehydrated when finally discovered. While at Yakima, appellant was returned to Fort Lewis after she was notified that her husband was hospitalized for atrial fibrillation, which, she testified, she thought was "a heart attack." Her husband was released from the hospital after 8 days, cleared for regular physical training, and eventually deployed to Saudi Arabia. When appellant was notified of her husband's hospitalization, she was heard to say, "Thank goodness my husband did get ill so I could come in from the field." Appellant explained by saying, "I shouldn't say thank goodness but at least it kept me from going AWOL."

Just prior to the offense which is the subject of this court-martial, appellant was alerted for a movement of her unit for field duty at Fort Hunter Liggett, California. On Monday, October 29, 1990, 4 days before she was to deploy to the Fort Hunter Liggett exercise, appellant asked to have a pass for Friday, November 2, 1990, to take care of personal business and "prepare for deployment." On the same date, her supervisor, Sergeant First Class (SFC) Sirwet, attempted to contact her unsuccessfully. He left a message on her answering machine, but she never made the formation scheduled for 1600 hours that afternoon. After several efforts to contact her, appellant finally returned SFC Sirwet's telephone calls and told him that she was not coming to the unit or "going to the field." When asked why, she simply said, "I just don't want to go"; when persuaded to come into the unit to talk, she responded, "Okay, I'll come in but I'm not going to the field."

Upon arriving at the unit, appellant talked to SFC Sirwet, as well as the first sergeant, the company commander, a chaplain, and another officer. She told them that she was not going to the field because she did not like the hardships of the field environment; she did not mention her husband's health as a factor in her decision. Her company commander advised her of "the consequences" of failing to report, but she replied that "she didn't care"; she would just "suffer the consequences."

The officers departed and SFC Sirwet tried unsuccessfully to reason with her. Appellant insisted that she would do anything to avoid going to the field, including slitting her wrists. SFC Sirwet advised the command of appellant's declaration and, on the same day, appellant was referred to a chaplain and the hospital for a psychiatric assessment. Appellant expressed to the chaplain her distaste for the field environment and also some concern for her husband's health. She told the evaluating physician that she did not "want to go to the field" because "it just didn't feel right." The physician tried to find out if there was any other reason she did not want to deploy, and she responded there was none.

After a physical examination and a detailed mental evaluation, appellant was cleared for deployment. Upon returning to the unit that evening, appellant was told by her company commander that she had to deploy with the unit the following morning at 0600 hours. Appellant indicated that she was not going, and she followed through by missing the troop movement.

At trial, when asked why she missed the troop movement, appellant testified, "I felt

that my husband was going to have a heart attack and I wouldn't be there to help him or maybe to save his life." She also testified that on November 2, 1990, she went to the community mental health office because of the stress of being separated from her husband. She was told that she could be helped, but she had to go through the chain of command; she never approached her chain of command.

## II

The Court of Military Review found that, in order to be entitled to an instruction on the duress defense, an accused must show:

> (1) an immediate threat of death or serious bodily injury; (2) a well-grounded fear that the threat will be carried out; and (3) lack of a reasonable opportunity to escape the threatened harm.

32 MJ at 974 (quoting *United States v. Beltran–Rios*, 878 F.2d 1208, 1213 (9th Cir. 1989)). Applying these factors, the court below found that the duress defense "was not raised by the evidence" based upon the following reasoning:

> In the case before us the fear of appellant that her husband would have a heart attack while she was in the field was not well grounded. Even in the eyes of witnesses on her behalf, her belief was irrational. Her belief was unreasonable and not well grounded. Further, appellant failed to produce evidence that the threat of a heart attack was immediate. The threat to her husband was mere speculation.

32 MJ at 974. We concur with the holding of the court below that the duress defense was not raised by the evidence.

■ We have no difficulty with the proposition that duress may be a defense to a missing-movement charge for the same reasons that duress may be a defense to a desertion charge. *See, e.g., United States v. Hullum*, 15 MJ 261, 265 (CMA 1983). Further, as we noted in *United States v. Williams*, 21 MJ 360, 362 (CMA 1986), "When a defense is reasonably raised by some evidence, it must be the subject of instruction if trial is by members...."

The issue before us, however, is not whether duress is a defense to missing movement. Rather, it is whether the duress defense—or more accurately, the necessity defense—was reasonably raised by the evidence at trial.

Manual for Courts–Martial, United States, 1984, specifically provides a defense for crimes committed due to unlawful coercion by third parties (duress) and for crimes committed in the proper performance of a legal duty (justification). The Manual for Courts–Martial does not specifically mention the defense for crimes committed due to a perceived threat from some unavoidable circumstance, condition, or fact which leaves no choice of action (necessity). *See generally* Milhizer, *Necessity and the Military Justice System: A Proposed Special Defense*, 121 Mil.L.Rev. 95 (1988).

In order to fully understand the issue presented, we will discuss the three special defenses to crimes involving a "choice of evils" and their respective application: the justification or public-duty defense, the necessity defense, and the duress defense. *See generally* Luckstead, *Choice of Evils: Defenses in Texas: Necessity, Duress, and Public Duty*, 10 Am.J.Crim.L. 179, 180 (1982). We will discuss each of the three "choice of evils" defenses and their application.

■ To establish the justification or public-duty defense it must be shown that "[a] death, injury, or other act [is] caused or done in the proper performance of a legal duty." RCM 916(c), Manual, *supra*. This defense applies to "the use of force by a law enforcement officer" or to "killing an enemy combatant in battle." RCM 916(c), Discussion.

The necessity defense is one which is not recognized in about one-half of American jurisdictions. Milhizer, *supra* at 96. The defense is, however, "anciently woven into the fabric of our culture" and

> [t]he common law elements of the defense are: 1) the harm must be committed under the pressure of physical or

natural force, rather than human force; 2) the harm sought to be avoided is greater than (or at least equal to) that harm sought to be prevented by the law defining the offense charged; 3) the actor reasonably believes at the moment that his act is necessary and is designed to avoid the greater harm; 4) the actor must be without fault in bringing about the situation; and 5) the harm threatened must be imminent, leaving no alternative by which to avoid the greater harm.

*Allison v. City of Birmingham,* 580 So.2d 1377, 1380 (Ala.Cr.App.1991), quoting Note, *Necessity as a Defense to a Charge of Criminal Trespass in an Abortion Clinic* (hereafter Note), 48 U.Cin.L.Rev. 501 (1979). *Accord* W. LaFave & A. Scott, *Substantive Criminal Law* (Necessity) § 5.4 at 627 (1986).

The problem with the necessity defense is that it involves a weighing of evil inflicted against evil avoided and is, thereby, difficult to legislate. Courts also have been reluctant to embrace the defense due to a "fear that private moral codes will be substituted for legislative determination, resulting in a necessity exception that swallows the rule of law." Milhizer, *supra* at 96–97 (footnotes omitted). *See also United States v. The Schooner Diana,* 74 U.S. (7 Wall.) 354, 361, 19 L.Ed. 165, 166 (1869) (" 'Nothing less,' says Sir William Scott, 'than an uncontrollable necessity, which admits of no compromise, and cannot be resisted,' will be held a justification of the offense. Any rule less stringent than this would open the door to all sorts of fraud."). This is because, unlike the duress defense where a "particular defendant is excused" from his criminal conduct, "although his action is not termed legal, ... if an action is justified by necessity, then a new rule of law is created which *instructs all future actors faced with the same conflict of values how to act." Allison v. City of Birmingham,* 580 S.2d at 1380, quoting Note, *supra* (emphasis added).

Military courts, likewise, have been reluctant to apply the necessity defense by judicial fiat. As with the case at bar, military courts have instead analyzed such criminal acts under the rubric of the duress defense. *See generally United States v. Talty,* 17 MJ 1127 (NMCMR), *pet. denied,* 19 MJ 237 (1984) (court declined to apply duress defense where accused refused to perform duties in the reactor compartment of a nuclear submarine, claiming that he feared exposure to dangerous levels of radiation); *United States v. Montford,* 13 MJ 829, 831 (ACMR 1982) (court declined to apply duress defense where accused explained that he went AWOL because he needed to return home "to straighten out an 'extreme family situation' involving his brother-in-law, his sister, and his mother"); *United States v. Guzman,* 3 MJ 740, 742 (NCMR) (court declined to apply duress defense where accused claimed he went AWOL because he believed that his assigned duties would aggravate his eye injury), *rev'd on other grounds,* 4 MJ 115 (CMA 1977).

To establish the duress defense it must be shown that an

accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily harm if the accused did not commit the act. The apprehension must reasonably continue throughout the commission of the act. If the accused has any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply.

RCM 916(h).

At common law the duress defense applied only to cases where the coercion was asserted by third persons. *See* W. LaFave & A. Scott, *Substantive Criminal Law* (Duress) § 5.3 at 614 (1986). A question remains whether a fair reading of RCM 916(h), its Discussion and Analysis (and cases cited therein), supports limiting the defense to its common-law application or rather to expanding the defense to include coercion from third persons or pressure from any physical or natural force.

Many American jurisdictions follow the Model Penal Code guidelines which recommend a broader choice-of-evils defense that is not limited to any particular source of danger.[1]

We need not resolve the issue whether RCM 916(h) was written broadly or narrowly because in this case we have no doubt that appellant was not entitled to an instruction on either defense.[2]

■ This case involves a wife who missed movement. Appellant's testimony at trial indicates that she did so out of fear that her husband would have a heart attack at home in her absence without anyone to assist him. Unfortunately for appellant, statements she made prior to missing movement indicate that she did so because she did not like participating in field exercises. Even without considering appellant's statements, the evidence of record plainly shows that appellant's husband suffered atrial fibrillation, not a heart attack, and there is no evidence that her husband was in imminent or indeed any danger of suffering a heart attack. In fact, appellant's husband was cleared for deployment to Saudi Arabia prior to appellant's trial.

Based upon these facts appellant would not be entitled to an instruction on either

the duress defense or the necessity defense because her alleged apprehension that her husband might suffer a heart attack at some unspecified time in the future satisfies neither the reasonableness nor the immediacy requirement of either defense. Further, and related to the immediacy part of the defense, there is no evidence that appellant tried to avoid committing the offense. Even if her husband was at risk of suffering a heart attack at some future date, the risk of his suffering an attack without assistance could be minimized by his wearing one of the electronic alert devices readily available on the open market.

We concur in the holding of the court below that the duress defense was not raised by the evidence and that the military judge did not err by refusing to give the requested instruction on the duress defense.

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

GIERKE, Judge (concurring in the result):

I agree with the lead opinion that the defense of duress was not raised by the

---

1. Model Penal Code § 3.02 provides:

> (1) Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:
>     (a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
>     (b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
>     (c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.
> (2) When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this Section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

ALI *Model Penal Code and Commentaries* 8–9 (1985).

2. In my view the plain language of RCM 916(h), Manual for Courts–Martial, United States, 1984, its Discussion and the Analysis (and cases cited therein) leads to the conclusion that the duress defense applies only to cases where the coercion is asserted by third persons. RCM 916(h), Discussion; RCM 916(h), Drafters' Analysis, Manual, *supra* at A21–57 (Change 2). *See generally* cases holding that the duress defense was not raised: *United States v. Stevison,* 471 F.2d 143 (7th Cir.1972), *cert. denied,* 411 U.S. 950, 93 S.Ct. 1933, 36 L.Ed.2d 411 (1973) (embezzlement by bank teller to cover daughter's overdrafts to prevent daughter from committing suicide); *Love v. State,* 271 Ind. 473, 393 N.E.2d 178 (1979) (robbery for money to buy heroin to prevent drug withdrawal); *State v. Gann,* 244 N.W.2d 746 (N.D.1976) (robbery to provide family with food and shelter); *Degler v. State,* 741 P.2d 659 (Alaska App.1987) (robbery to secure funds to attend a custody hearing). In light of the difficulties to be encountered in applying the necessity defense, particularly in the absence of any legislative or executive guidance, I would decline to adopt the necessity defense by judicial fiat.

evidence. The findings of fact by the Court of Military Review amply support a conclusion that appellant's fear regarding her husband's health, if genuine, was totally irrational. Since the requirement for some evidence of a "well-grounded fear" was not met, the defense was not raised.

I reserve judgment on the question whether the "necessity" defense, separate from the "duress" defense, is recognized in military criminal law.

SULLIVAN, Chief Judge (dissenting):

The granted issue in this case is:

WHETHER THE MILITARY JUDGE ERRED BY REFUSING TO INSTRUCT THE MEMBERS THAT DURESS WAS A DEFENSE TO MISSING MOVEMENT, WHERE APPELLANT TESTIFIED THAT SHE HAD MISSED MOVEMENT OUT OF FEAR THAT HER HUSBAND, WHO SUFFERED FROM A HEART CONDITION, WOULD HAVE A HEART ATTACK AT HOME IN HER ABSENCE WITHOUT ANYONE TO ASSIST HIM.

Based on the record before me, I conclude that the court members should have been permitted to consider appellant's defense of duress. *See generally Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704. 2708–09, 97 L.Ed.2d 37 (1987). I do not agree with the lead opinion's conclusions that there was no evidence her fear was reasonable and the danger of death or serious bodily harm was immediate.

I believe that the lead opinion's statement of the facts is not full and complete and it tends to rely on the Government's version of the facts. Thus, I think it only fair to quote appellant's statement of facts from her final brief, complete with citations to the record, in order to determine whether there was any evidence raising the defense.

### STATEMENT OF THE FACTS

Appellant and her husband were active-duty soldiers stationed at Fort Lewis, Washington (R. 147–48). During the period 3–15 October 1990, appellant was sent on a field exercise to Yakima Firing Center, while her husband remained at home (R. 148). On the sixth day of that exercise, appellant learned that the wife of a Specialist (SPC) Holmes had died of a heart attack while Holmes was in the field (*id.*). Appellant was told that Holmes' wife "had been dead for two days and her baby was all dehydrated in the apartment and everything and nobody had checked up on her or anything like that" (R. 149). Appellant was considerably distressed by this tragic news (*id.*), as her own spouse had suffered from high blood pressure for some time (R. 69).

On 9 October 1990, while appellant was still at Yakima and after she had learned about SPC Holmes, appellant's husband suffered an "atrial fibrillation" at home and had to call an ambulance (R. 130). He was admitted to the hospital at Madigan, but appellant was not notified until two days later (R. 150). She was released from the field the day after she was notified, and went directly to Madigan to see her husband (*id.*). At the hospital, her husband was "really pale" and was hooked up to "a heart monitor or some kind of machine. He had an IV in his arm" (*id.*). He was in the hospital for about eight days (R. 132). Even after release, "[h]e was tired all the time and always—continually complaining about pains in his chest and down his left arm" (R. 151). He remained on medication (*id.*).

Meanwhile, appellant had been "scheduled to deploy to Fort Hunter Liggett" in November "to support a task force from this division for training up to Fort Irwin, California" (R. 55). While she was visiting her husband at the hospital, appellant was assured by her supervisor, Sergeant First Class (SFC) Sirwet, that she probably would be exempt from that field exercise (R. 71–72). About three or four days prior to the scheduled deployment, however, Sirwet told appellant, "Well, they decided—they changed their minds. They need you to go now" (R. 154). Appellant related this to her husband, who was still having chest pains at the time, but told him, "I'm not

going to leave you while you're in this condition" (R. 133). Thus, at 1630 hours on 2 November, appellant told SFC Sirwet over the telephone that she would not be going to the field (R. 58). Sirwet persuaded her nonetheless to come to the personnel office and "talk about it" with him and Captain Chisholm, the officer-in-charge (R. 59).

At 1730, appellant arrived at the office, where she was confronted by Sirwet, Chisholm, the company commander, the first sergeant, and a lieutenant (*id.*). Appellant told them that she did not want to go to the field because "she didn't want to experience what she had experienced at Yakima" (*id.*). Moreover, according to her testimony, she specifically voiced her concerns about her husband (R. 160). Appellant was so upset that she threatened to slit her wrists (R. 61, 74, 160), whereupon SFC Sirwet called the battalion chaplain (R. 61), who came to the office and spoke with appellant and her husband together (R. 119). Appellant told the chaplain she was afraid of "what would happen if [her husband] had another spell and if he were all alone" (R. 120). She thought "it was lucky" that her husband had made it to the hospital in time on the previous occasion (*id.*).

After her discussion with the chaplain, appellant was taken to Madigan for a mental status evaluation (R. 63). At no time during this series of events did hospital officials or appellant's chain of command offer to provide assistance to appellant's husband should appellant deploy to the field. Thus, on 3 November 1990, she failed to make the scheduled movement to Fort Hunter Liggett (R. 64). At trial, when asked why she refused to go on the field exercise, appellant testified, "I felt that my husband was going to have a heart attack and I wouldn't be there to help him or maybe to save his life" (R. 164). The Government presented contrary evidence that appellant had told the chaplain and her chain-of-command that she simply disliked the field environment (R. 76, 81, 93, 122).

Since the defense theory was that appellant had been afraid for her husband's safety (R. 53, 119–20, 133, 164, 222–23), the defense requested that the military judge give the panel the standard instruction on the defense of duress (R. 191–96). The military judge refused, holding that, in his opinion, the danger to appellant's husband was not "immediate" at the time of the offense (R. 194), and appellant's fear for her husband's safety was based on "pure speculation" (R. 239).

The defense of duress—or more accurately in this case, necessity (*see United States v. Bailey*, 444 U.S. 394, 409–10, 100 S.Ct. 624, 634–35, 62 L.Ed.2d 575 (1980))—is not new to military law. *See United States v. Jemmings*, 1 MJ 414, 417 (CMA 1976); *United States v. Pinkston*, 18 USCMA 261, 262, 39 CMR 261, 262 (1969). It is generally available to a servicemember who acts unlawfully because of a well-grounded apprehension or fear of *immediate* death or serious bodily harm to himself or another. We have generally followed federal law concerning this defense, and we have indicated our satisfaction with the Manual's exposition of it. *See generally United States v. DeHart*, 33 MJ 58, 61–62 (CMA 1991); *United States v. Beltran–Rios*, 878 F.2d 1208, 1213 (9th Cir.1989). *See* RCM 916(h), Manual for Courts–Martial, United States, 1984.

In appellant's case, we are specifically asked to review the judge's decision not to instruct on the defense of duress. *See United States v. Bailey, supra*, 444 U.S. at 415 n. 11, 100 S.Ct. at 637 n. 11. It is not our role to consider *de novo* the reasonableness of appellant's fear or the immediacy of the threatened death or serious bodily harm. However, we do consider *de novo* whether there was some evidence in the record from which the members could rationally conclude that appellant's fear for her husband's life or health was well grounded and whether there was any evidence that any threat in this regard concerned immediate harm. *Id. See United States v. Watford*, 32 MJ 176, 178 (CMA 1991); *United States v. Schoon*, 939 F.2d

826, 827 (9th Cir.1991). The existence of contrary evidence does not negate the requirement for giving appropriate instructions on this defense. *United States v. Jones,* 13 USCMA 635, 640, 33 CMR 167, 172 (1963) (Kilday, J., concurring in the result); *see generally Commonwealth v. Melzer,* 14 Mass.App. 174, 437 N.E.2d 549, 555 (1982).

Some evidence was presented in this case that appellant had a well-grounded fear that her husband would suffer a fatal heart attack if she moved with her unit on November 3, 1990. *See State v. Castrillo,* 112 N.M. 766, 770, 819 P.2d 1324, 1328 (1991). First of all, there was evidence of her knowledge of the sudden death of a fellow soldier's spouse from this same condition while that soldier was on field duty. In addition, her husband, Staff Sergeant Robert R. Rankins, testified as follows:

Q. Can you tell the court about your medical problem, starting with October 9th? What happened to you on October 9th?

A. On October 9th I was laying on my bed and I thought I was having a heart attack. I got tightness in the chest, my left side started hurting, I couldn't breathe so I called 911.

Q. And then what?

A. And then the ambulance showed up at my house. They did a field expedient EKG on me. They didn't know what was going on. They called Madigan and the doctor said to get me in immediately. Tacoma Fire Department said they couldn't take me because they would cross their jurisdiction so I drove in myself.

Q. And when you got there how did you feel?

A. I felt the same, ma'am.

Q. What did Madigan do?

A. Madigan hooked me up to an EKG machine, started an IV on me, gave me tranquilizers, and I was going through atrial fibrillation, which the top portion of my heart stopped beating and the bottom just sat there and floated. It just kept my blood pressure going.

Q. What did you believe was happening to you?

A. I thought I was having a heart attack.

Q. What did the doctor tell you?

A. The doctor said I was having a—an irregular heart beat.

Q. How long were you in the hospital?

A. I was in the hospital about 8 days.

Q. Your condition, did it stabilize rather quickly?

A. In about two days.

Q. *Did the doctors know what caused it?*

A. *No, they don't.*

Q. *Were the doctors able to tell you that it wasn't going to happen to you again?*

A. *They say it may happen again because I do have high blood pressure.*

Q. *Were they able to tell you that it wouldn't be worse the next time?*

A. *No, ma'am.*

Q. When did your wife find out about you being in the hospital?

A. My wife came to the hospital a few days after I was in the hospital.

Q. Okay. What took so long for her to get there, do you know?

A. Apparently, she was notified out in the field by——

TC: Objection, hearsay, Your Honor.

MJ: I'll permit that.

Q. Go ahead.

A. Well, when she came to the hospital she said that she was out in Yakima and a private told her when she went up to utilize the latrine that "your husband is in the hospital." This was a couple of days after I had been admitted.

Q. Okay. When were you released from the hospital?

A. The date, ma'am?

Q. About how many days later?

A. I was in the hospital for about 8 days.

Q. Did you go back to work?

A. Yes, I did, ma'am.

Q. Did you go back to PT?

A. Yes, I did.

Q. How were you feeling?

A. *I had a pain all around the area of my heart, I had a sharp pain going through my chest.*

Q. *Did you tell your wife that you thought you'd had a heart attack?*

A. *Yes, I did.*

Q. *Did you tell your wife that you were continuing to have chest pains?*

A. *Yes, I did, ma'am.*

Q. How did your wife handle that?

A. My wife was very upset.

(Emphasis added.)

As for the element of immediacy, appellant's testimony provided some evidence that her husband's heart problems were particularly exacerbated by her absence on trips to the field and that one was scheduled for November 3, 1990. Moreover, some evidence of military unresponsiveness to this situation was presented. *See United States v. Jemmings, supra.* The record states:

Q. Did Sergeant Sirwet come to the hospital?

A. Yes, immediately. Right after I got there. I'd say I was there for about 10 or 15 minutes and Sergeant Sirwet showed up and he said that "he's sorry that he wasn't there to pick me up at the bus." He told the duty driver to get in touch with him instead of just coming to pick me up.

Q. Did he talk to you about going to the next field exercise?

A. Yes. He said, "Rankins, don't worry you won't have to go to—you won't have to go back out to this field problem at all. You're going to be here with your husband. You're going to be my mail clerk this next field problem coming up so don't worry about being away from him."

Q. Okay. How long was your husband in the hospital?

A. For about two weeks.

Q. What did your husband tell you happened to him?

A. That he had a mild heart attack and high blood pressure.

Q. When he was released was he back to his normal self?

A. No.

Q. How was he different?

A. *He was tired all the time and always—continually complaining about pains in his chest and down his left arm.*

Q. *Was he still on medication?*

A. *Yes, he was still on medication. He was still an outpatient at the hospital.*

Q. *Why do you believe—why did your husband have a heart attack?*

A. *Well, when he was in the hospital the doctors couldn't find out. They said they didn't know why he had a heart attack or whatever. They said that they thought it was maybe stress. So, they had him talk to a psychiatrist and some—a Colonel up there and she said that—*

TC: Objection, Your Honor, hearsay.

MJ: Well, it's her belief as to why she thought he had a heart attack. I'll permit that.

A. *He had to talk to a Colonel up there and she said that it—"why—what do you think is the problem?" to him and he said, "it's because me and my wife are always separated. I just came from BNCOC, now she's living in the field, and every time I turn around we're separated and I just can't"—he couldn't take the stress or the pressure. He was tired of us being separated. He just wanted me to be out of the Army.*

Q. Okay. Has anything like this ever happened before?

A. Like in BNCOC?

Q. *Him having medical problems when you're apart?*

A. *Yes. He—the—when he went to BNCOC he was there for about six weeks and, first, he had high blood pressure. He said he fell out in class and they took him to the hospital*

*and he was there for one day. The second time he had to be rushed to the hospital again. He was in the hospital for about two days with high blood pressure. It just seemed like it kept getting worse.* And then after that, when he came home from BNCOC, he said that—from BNCOC— he said he was doing okay but he had like 10 or 15 bottles of medication. He had all kinds of stuff happen to him when he was there. And then when he came home he said, "Honey, I'm okay. This medicine is taking care of my high blood pressure. I'm doing just fine." So,—and then they told me I had to go to Yakima and I said, "well, okay. It's only going to be a little while." *He told me he's okay so I believed it and I went to Yakima. And the next thing I know I'm getting called back. He said he had a heart attack and more high blood pressure.*

Q. When did he return from BNCOC with all the medication?

A. I don't—it was about two weeks before I went to Yakima.

Q. Did you believe that your husband was completely recovered on 2 November '90?

A. No.

Q. Why not?

A. Because he was still complaining about the chest pains, even though he said he was okay. He's like the really gung ho type of person. He'll try to do his best—I think that he could do a lot—He might even kill himself trying to be the best or whatever but I don't feel he was in—I knew he was in bad shape because he was still complaining.

Q. *What did you believe would happen to him if you left him at that point?*

A. *I felt that he would have another heart attack and this time I would be in California and I wouldn't be able to get back and see him.*

(Emphasis added.)

Finally, there also was some evidence presented that appellant took reasonable steps to avoid this potential crisis:

Q. Okay. After Sergeant Sirwet told you that you didn't have to go on the next field exercise, when did you learn that you would have to go?

A. About three to four days before the actual field problem.

Q. Okay. Why didn't you find out until three or four days before the field problem?

A. Because he told me I was going to be—I was going to be a mail clerk there and all of a sudden he—he just told me, "Well, they decided—they changed their minds. They need you to go now."

Q. So what did you do?

A. What did I do?

Q. Yes.

A. Well, I was really upset because I was afraid that—I was like, "now, if I go I'm going to have to go to California and leave my husband." I didn't know what to do. But I knew I had to go to the field because they knew— Sergeant Sirwet knew my husband was in the hospital and all that and he didn't seem to care so I didn't know what to do. So, I just prepared to go to the field.

Q. Did you make appointments with anyone?

A. We had an appointment because my husband had to see like this stress psychology [sic]—somebody up in mental health—community mental health.

Q. Okay.

A. And we had to see a major up there and we had been—we'd seen him, I think, twice and this time we were supposed to talk to a colonel. And he said that he was going to do something to help us because the stress was—he felt, after he talked to my husband, was caused because we were separated so much. And that he was going to see us on Wednesday and then he called back and he said he changed it to Thurs-

day. Then he changed it to Friday in the morning—that Friday.

Q. *Okay. Friday, November 2d?*

A. Yes.

Q. Why didn't you tell the chain of command once you found out that you were designated to go—why did you let four days go and you didn't tell them that you couldn't handle it, that you couldn't go because you wanted to be with your husband?

A. *Because I—me and my husband we were going to this mental health thing and this major said that he would help—he was going to help my husband. He was going to let us talk to this colonel this time and she was going to take care of things for us. And my husband* explained, "do you know that they want to send my wife to the field this afternoon?" or something. Well,—no, he said, "Well, do you know they want to send my wife to the field on Friday?" and that was the last time we had seen him. And he said, "Well, I will let you speak to the colonel and she will handle this[.]" The colonel at this mental health place.

Q. So, let's go to the 2d of November in the morning. What happened? Start from the beginning.

A. That was the day—Was that Friday?

Q. Yes.

A. *Okay. We had this appointment. We went up to see this colonel and we talked to Major Dunn, I think his name was. And all of a sudden he had changed his mind.* He didn't want us to—he was just relaying a message to the colonel. We didn't get to see her at all. *And he said, "We can help you" to my husband. He said, "We can help you but—we can give you all these tests first—we have to give you all these tests first.* But for your wife to get any help she would have to go through the chain of command—the chain of command to get any help."

Q. Okay. So then what did you do?

A. *My husband said, "No, we need—I wanted her to be with me." Or he wanted me to be with him now and "that's okay." He said, "just forget it" and we left there.*

Q. So then what?

A. We went home. We went directly home. I had started packing my—Well, my TA50 was already packed. I had started packing some of my other stuff—my other clothes. And then I stepped out and I was thinking. "I don't know what to do...."

(Emphasis added.)

An American servicemember has a constitutional and codal right to defend himself or herself at a court-martial. The majority today eviscerates this right by utilizing the rubric of judicial reasonableness to preclude even consideration of her defense by court members. Her defense to the charge was not a strong one, but it *was* her *only* one. In my view, the majority's concerns are properly questions of fact for the court members to decide. *See United States v. Bailey, supra* 444 U.S. at 414–15, 100 S.Ct. at 636–37.

WISS, Judge (dissenting):

I dissent. First, for a number of reasons, I am unsettled by that portion of the lead opinion that suggests that the defense of duress, *as that defense is defined and applied in military jurisprudence,* is limited to threats posed "by third persons," 34 MJ at 330 n. 2, and does not include threats "from some unavoidable circumstance, condition, or fact which leaves no choice of action," *id.* at 328; and I certainly disagree with footnote 2 in which the author judge expresses her personal conclusion that the defense is so limited. Second, viewing that defense in the light in which it historically has been recognized in military jurisprudence, I believe that the military judge and the Court of Military Review erred by applying an incorrect legal analysis to determine whether the defense was reasonably raised by the evidence.

## I

Although the matter is not squarely presented to this Court or briefed by the parties, over half of the legal discussion of the lead opinion is dedicated to questioning whether the "necessity defense" exists in military jurisprudence—and, as mentioned above, the author judge answers that question for herself in the negative. Several aspects of this discussion and the author judge's conclusion disturb me.

## A

Although it is unstated, the notion is necessarily implicit in the lead opinion that the Manual for Courts–Martial is the conclusive authority for whether a concept is an available affirmative defense in military law. To illustrate, the objectionable portion of that opinion begins:

> *Manual for Courts–Martial, United States, 1984,* specifically provides a defense for crimes committed due to the unlawful coercion by third parties (duress) and for crimes committed in the proper performance of a legal duty (justification). *This Manual for Courts–Martial* does not specifically mention the defense for crimes committed due to a perceived threat from some unavoidable circumstance, condition, or fact which leaves no choice of action (necessity).

34 MJ at 328–329 (emphasis added). A good while later, near the end of that portion of the opinion, it observes:

> *A question remains whether a fair reading of RCM 916(h), [Manual, supra,] its Discussion and Analysis (and cases cited therein), supports* limiting the defense to its common-law applications or rather to expanding the defense to include coercion from third persons or pressure from any physical or natural force.

34 MJ at 329 (emphasis added). Finally, that section ends shortly thereafter with this statement:

> We need not resolve the issue *whether RCM 916(h) was written broadly or narrowly* because in this case we have no

doubt that appellant was not entitled to an instruction on either defense.

34 MJ at 330 (emphasis added; footnote omitted). I know of no legal basis for the notion that is reflected by this language. *See* Art. 36(a), Uniform Code of Military Justice, 10 USC § 836(a). Availability of defenses is an issue of substantive law; as such, the Manual is no more conclusive on that question than it is on the matter of the elements of one of the crimes specifically set out in the Uniform Code of Military Justice. *Id.*

## B

Though acknowledging that what it calls the "necessity defense" is " 'anciently woven into the fabric of our culture,' " the majority downplays the scope of its acceptance by asserting, "The necessity defense is one which is not recognized in about one-half of American jurisdictions." 34 MJ at 328. My reading of the source relied upon for that assertion, however, does not support it.

The article cited—Milhizer, *Necessity and the Military Justice System: A Proposed Special Defense,* 121 Mil.L.Rev. 95, 96 (1988)—urges clearcut recognition of the necessity defense and, in the process, states that it is "explicitly included as part of the Model Penal Code, and 'is recognized in about one-half of American jurisdictions.' " The author's quotation is from a *1984* text, and in the accompanying footnote he opines: "Indeed, this statement probably underestimates the growing acceptance of the necessity defense. *See infra* notes 109–22 and accompanying text." 121 Mil. Rev. at 96 n. 6.

The notes and text referenced by the author support his expanded estimation. Specifically, he later writes:

> At least three federal circuit courts have explicitly recognized the necessity defense. *No recent federal case purports to categorically reject the defense of necessity.* Accordingly, especially when considered in combination with earlier federal precedent, *a strong case can be made that the necessity defense has*

*gained general acceptance in federal law.*

*Numerous state courts* have also applied the necessity defense *absent specific statutory authorization....*

*At least twenty other states and three territories or protectorates have codified* some variation of the necessity defense....

*Id.* at 109–10 (footnotes omitted; emphasis added). Thus, the *1988* article cited by the lead opinion acknowledges that the necessity defense is experiencing "growing acceptance":

The "defense has gained general acceptance in federal law," has been codified in "[a]t least twenty ... states and three territories," and has been applied in "[n]umerous [other] state courts." This does not reflect support for the lead opinion's assertion that the defense "is not recognized in about one-half of American jurisdictions."

C

Finally, as to whether the "necessity defense" is available in courts-martial, I must comment both on the lead opinion's discussion that questions whether military courts have applied it and on the author judge's personal observation in footnote 2 of her opinion which opines that RCM 916(h) does not include it; *but see* conclusion of part B of this opinion.

In footnote 2, the author judge states: "In my view the plain language of RCM 916(h), Manual for Courts–Martial, United States, 1984, its Discussion, and the Analysis (and cases cited therein) leads to the conclusion that the duress defense applies only to cases where the coercion is asserted by third persons." It is submitted that—when properly construed—the language of the rule, the accompanying Discussion, and the Analysis of the rule do not support this conclusion.*

RCM 916(h), which acknowledges the defense of *"[c]oercion* or *duress,"* defines it as follows:

It is a defense to any offense except killing an innocent person that the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act. The apprehension must reasonably continue throughout the commission of the act. If the accused has any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply.

Nowhere in this provision is there even an *implied* limitation as to the *source* of the threat of death or serious bodily injury that will excuse an accused's coerced act.

The Discussion that accompanies this rule reads:

The immediacy of the harm necessary may vary with the circumstances. For example, a threat to kill a person's wife the next day may be immediate if the person has no opportunity to contact law enforcement officials or otherwise protect the intended victim or avoid committing the offense before then.

This Discussion addresses only the *immediacy* of the harm that is feared, not the *source* of the harm. If the author judge is construing the sole *example* given to demonstrate the *immediacy* element to suggest that this defines the whole *universe* of the *source*—an aspect not even indirectly mentioned in the Discussion—such suggestion is a *non sequitur.*

Finally, the Analysis of RCM 916(h) states:

(h) *Coercion or duress.* This subsection is based on paragraph 216*f* of MCM, 1969 (Rev.). Paragraph 216*f* required that the fear of the accused be that the accused would be harmed. This test was too

---

* Moreover, the Federal and State cases cited in footnote 2 all involved "economic" coercion, which has uniformly been rejected as a valid basis for the defense of duress. *See* R. Perkins and R. Boyce, *Criminal Law* 1067 (3d ed. 1982).

narrow, as the fear of injury to relatives or others may be a basis for this defense. *United States v. Jemmings*, 1 MJ 414 (CMA 1976); *United States v. Pinkston*, 18 USCMA 261, 39 CMR 261 (1969). The discussion is based on *United States v. Jemmings, supra.*

Manual, *supra* at A21–57 (Change 2). There is no indication at all in this "plain language" that the defense is limited as to the *source* of the threat. Paragraph 216*f*, Manual for Courts–Martial, United States, 1969 (Revised edition), upon which the rule was based, contained none; and the only deviation from paragraph 216*f* that the drafters of the rule acknowledged was to *expand* the potential *victims* of the threat to include others than the accused. Although the two cases cited do happen to involve threats posed by third persons, there is no indication anywhere in the language of those opinions that the Court perceived that the defense was limited to such a source.

In sum, there is no language—"plain" or otherwise—to even suggest that, *in the evolution of military jurisprudence*, what has been called the defense of duress was limited to threats posed by third persons.

In this regard, I note that the lead opinion contends that "[m]ilitary courts ... have been reluctant to apply the necessity defense by judicial fiat. As with the case at bar, military courts have instead analyzed such criminal acts under the rubric of the duress defense." 34 MJ at 329. I put aside for the moment the related questions whether such application by military courts of a necessity defense *would* be by judicial fiat and, if so, the implied impropriety of such judicial fiat. Here, I pause to point out that, regardless of what "rubric" has been used, the fact is that military courts *have* acknowledged availability of a defense where the source of a threat is other than a third party—and with no apparent discomfort.

In such cases, the courts have analyzed the persuasiveness of the defense in the case before it in the same way as it has where the threat is from a third person.

The cases cited by the lead opinion demonstrate as much. *See United States v. Talty*, 17 MJ 1127, 1129 (NMCMR) (Where an accused had pleaded guilty, the court found incredible the accused's appellate claim that, in the military, he could refuse to obey an order where the mission would put him " 'in harm's way.' "), *pet. denied*, 19 MJ 237 (1984); *United States v. Montford*, 13 MJ 829, 831 (ACMR 1982) (where the claimed duress emanated from the accused's "brother-in-law's continued 'harassment' of his family" but the record did not reflect that the accused was "apprehensive of immediate death or serious bodily harm for his family"); *United States v. Guzman*, 3 MJ 740, 742 (NCMR) ("It is not possible to infer that appellant could reasonably have feared that *immediate* death or serious bodily injury would occur...." from his performing his assigned duties.), *rev'd on other grounds*, 4 MJ 115 (CMA 1977).

As to the related questions momentarily put aside earlier regarding military courts doing this by "judicial fiat," I offer this observation. As the foregoing makes clear, nothing in the historical evolution of the Manual for Courts–Martial implies any limitation on availability of the duress defense that is linked to the source of the threat. Accordingly, whatever reliance the majority places on the need for the presence of an affirmative defense in the Manual, I suggest that their fears are assuaged. Moreover, I earlier expressed my views about the limit to the conclusiveness of the inclusion or exclusion of a substantive matter in the Manual. It is the responsibility of military courts and this Court to assure that due process and fundamental fairness govern our system of justice; pejoratively labeling that concern as "judicial fiat" does not reduce its availability or its legitimacy.

### D

In sum, the lead opinion questions whether what it describes as the "necessity defense" is available to a military accused at a court-martial, and the author judge per-

sonally answers that question in the negative. I do not share either view.

As that opinion acknowledges, that defense is " 'anciently woven into the fabric of our culture.' " 34 MJ at 328. It is woven, as well, into the fabric of military justice. Although RCM 916(h) is *entitled* "*[c]oercion or duress,*" the rule itself does not mention any of the buzzwords of "coercion," "duress," or "necessity." RCM 916(h) says nothing whatsoever about the *source* of the "reasonable apprehension" it recognizes; in the process, therefore, it acknowledges that the *source* of "a reasonable" fear "that the accused or another innocent person would be immediately killed or ... suffer serious bodily harm" is not legally or logically relevant. In short, in military jurisprudence, "necessity" is *incorporated* in what historically has been labeled—accurately or not—"duress."

It makes little difference whether "necessity" is separately recognized or is found within "duress," as RCM 916(h) treats it. Even the elements of "necessity," as set out in the lead opinion, differ little in substance from those of duress, except for the source of the threat. What *is* important is this:

> Regardless what it is called, the notion that an accused can be compelled to avoid immediate death or serious bodily harm to some innocent person by committing some lesser act which otherwise would be criminal must *remain* a concept that is " 'anciently woven into the fabric of our culture.' " Today, the lead opinion tears at that fabric; the author judge rends it.

In the process of questioning/renouncing a legally appropriate and humanely sensible defense that no one in the military justice system, until today, has refused to embrace, the lead opinion would have this Court become the *only* Federal court in recent times to shun an affirmative defense based on the *source* of the reasonable fear of immediate death or serious bodily harm.

*See* Part I B of this opinion, *supra*. That would not be a bright day for this Court— or for military justice.

## II

As the majority at least acknowledges, "When a defense is *reasonably raised by some evidence*, it must be the subject of instruction if the trial is by members...." *United States v. Williams*, 21 MJ 360, 362 (CMA 1986). Thus, unlike the situation where the contention in this Court is that the evidence is legally insufficient to sustain a conviction, the *sole* focus of our concern here is on the quantity ("some evidence") and quality ("reasonably raised") of the *defense* evidence. The relative weight of the *prosecution's* contrary evidence is not relevant to this appeal.

It is in this respect that I believe the military judge and the Court of Military Review misstepped. While purporting to look for "some evidence" offered by the defense of the elements of duress, *see* RCM 916(h), their focus on the prosecution's evidence belies this claim. The majority of this Court similarly errs when it concludes that no affirmative defense was raised by the evidence; while phrasing its view in terms of whether appellant's fear was "reasonable," the majority's textual discussion of—and emphasis on—the *prosecution's* evidence is telling.

For the reasons and upon the evidence more fully set out by the Chief Judge in his dissenting opinion, I believe that there was, indeed, "some evidence" that "reasonably raised" the defense of duress. It is for the *factfinder at trial*—not the military judge as a matter of law and not the Court of Military Review *ab initio* as a matter of fact—to weigh its credibility against the Government's evidence to the contrary.

Accordingly, I would reverse the decision below.